# EXHIBIT B
## To Declaration of Alex S. Trepp

1

1

**Robert R. Prunte', (pro se')**
2
1702 Linden Avenue
Baltimore, Maryland 21217
3
301.514.4028 410.225.9940

RECEIVED

MAY - 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

4

5

6
## UNITED STATES DISTRICT COURT

7
## FOR THE DISTRICT OF COLUMBIA

8

9
**ROBERT R. PRUNTE' & YOWORLD MUSIC CO.
dba ROWDY CITY RECORDS**

10
**Plaintiff,**
Vs.

**CASE NUMBER: 1:06-cv-0048**

11
<u>UNIVERSAL MUSIC GROUP dba UMG
RECORDINGS;</u> C/O CT CORPORATION SYSTEM,
**JUDGE: PLF**

12
**111 EIGHTH AVENUE, NEW YORK, N.Y. 10011;** &
BOARD OF DIRECTORS & ZACH HOROWITZ,
NICK HENRY, SHAWN (JAY-Z) CARTER, 50 CENT;

13
L.A. REID, "BABY" (CASH MONEY RECORDS) &
INSIDE SESSIONS, DINO DELVAILLE; DAMON

14
DASH OF ROC-A-FELLA RECORDS; DEF JAM
MUSIC GROUP; G-UNIT RECORDS; INTERSCOPE
**UNLAWFUL COPYING**

15
RECORDS & CASH MONEY RECORDS, GEOFF
SEIGEL, BRIAN WITTMER; (SUBSIDIARIES) &
**PRACTICES ADMITTED**
**(FED. R. EVID. 801)**

16
PERIPHERAL ARTIST/AGENTS: <u>KANYE WEST;</u>
<u>BRANDY NORWOOD; LlOYD BANKS; JUVENILE;</u>

17
<u>LIL WAYNE; ROY JONES JR. EMINEM; T.I.; YING</u>
<u>YANG TWINS; FAT JOE; LUDACRIS</u> & <u>JOHN</u>
**AMENDED COMPLAINT**
**(AS OF COURSE)**

18
<u>LEGEND;</u> **WARNER MUSIC GROUP ; dba**
**ATLANTIC RECORDING CORPORATION); :**C/O

19
CT CORPORATION SYSTEM, 111 EIGHTH
**VICARIOUS AND CONTRIBUTORY LIABILITY**

20
AVENUE, NEW YORK, N.Y. 10011 & BOARD OF
DIRECTORS & CHAIRMAN TED TURNER &
**RESPONDEAT SUPERIOR**

21
AHMET ERTEGUN & ATLANTIC RECORDS &
WARNER CHAPPELL PUBLISHING COMPANY
**CONTROLLING PERSON DOCTRINE**

(SUBSIDIARIES), & ADAM FISCHELL & RICH
CHRISTINA; <u>VIACOM INTERNATIONAL</u>, C/O
**AGENCY DOCTRINE**

22
**SPIEGEL & UTRERA, P.A.P.C., 45 JOHNS STREET**
**711, NEW YORK, N.Y. 10038;** & BOARD OF
**CHAIN OF RESPONSIBILITY DOCTRINE**

23
DIRECTORS & SUMMER REDSTONE & BET , MTV
& VHI & PARAMOUNT PICTURES,
**PRIVATE ATTORNEY GENERAL**
**ACTION**

24
(SUBSIDIARIES).

**Defendant (s)**

25
**JURY TRIAL DEMAND**

## A CIVIL COMPLAINT FOR:

**DIRECT COPYRIGHT INFRINGEMENT, CONTRIBUTORY COPYRIGHT INFRINGEMENT, FALSE ADVERTISING UNDER THE LANHAM ACT 15 U.S.C. 1125 (43(a)), CIVIL RICO, BANK FRAUD; EXTORTION; CRIMINAL COPYRIGHT INFRINGEMENT, TRAFFICKING IN COUNTERFEIT LABELS; INTERSTATE TRANSPORTATION OF STOLEN PROPERTY; TRAVEL ACT; THEFT AND MISAPPROPRIATION OF TRADE SECRETS UNDER ECONOMIC ESPIONAGE ACT OF 1996; BREACH OF CONFIDENTIAL & FIDUCIARY RELATIONSHIP & RESPONDEAT SUPERIOR**

## STATEMENT OF THE CASE

Imagine being the chief executive of a conglomerate entertainment company, constantly swimming like a shark amongst a small cadre of other simularly situated executives, all trying to maintain unique ways to stay ahead of each other, or at

least stay in the same shark infested waters for as long as possible, all hoping to maintain the status of their respective companies in the top 5.

You realize that to maintain the magical allure of number one status (or top 5 status), competitively, original ideas and strategies must be tested and implemented that will insure strong performance in all markets concerned, with the least investment possible.

However, when the spirits of ingenuity and competition mix, laws tend to get broken and rules tend to get bent, as one competitor seeks new and sometimes unscrupulous ways to outfox the other 4 competitors year after year after year. Since you happen to be in the madly speculative and wildly fluctuating entertainment business, and already occupying top 5 statuses, you must find ways to obtain and maintain original product and content, preferrably in the most ethical and cost effective manner possible.

Traditionally, a "may the best song win" type process of selection concerning the work as well as its creators were what catapulted a song to rewarding financial highs, not to mention the high powered artist that had to undergo grueling song-casting sessions to become the labels selection to perform a certain song.

3

Nowadays however, you learn that it is not always cost-efficient to have to pay the author as well as produce and exploit his or her creative efforts, cast the right artist to match the songs selected, make sure all people involved with that particular song are compensated or have proper contractual alignment with your company, before any of those efforts concerning one particular song or album make any money. This factor caused the doom of many previous labels that failed to master the art of cutting those initial high costs of dealing with original song content and its owners. This factor proved to be too speculative for prosperity. Hence, a dilema arose.

Somehow, the top 5 must find ways to "purloin" original song content, with the authors consent, and not have to place the author into a lengthy and binding financial agreement about the song(s), or signing a publishing deal with the author. Instead, you can merely have a stable of artists ready to perform at will the songs you have lifted from hapless authors believing you may wish to work with them in the future.

This policy saves millions of speculative dollars that would have been spent binding the authors and the songs to the label, like in the past. With a vehicle for lifting songs with author's permission, you apply the art of close paraphrasing and

4

proceed; selecting the most prolific authors songs in the country steal from.

Soliciting them, seducing them and eventually abusing the most important songs in

their catalogs.  Yours has truly become a seek and destroy mission, meant merely

to control the mind of the marketplace, no matter who loses or gets hurt.

Now you know for sure that every project will make a profit.


You believe this sounds like a crafty strategy with a chance of longetivity and some

air of legitimacy, as long as the works are "re-created" or "close paraphrased" by

your huge network of companies, and masked as new works, with new words and

faces, the scheme should make lots of money and rob lots of authors.


 Unfortunately, original authors have begun to file suit against your company for

unlawfully making derivative songs from their original expressions.  You have

been ill advised concerning your strategy for acquiring original song content.  What

you have actually done is violated the authors rights to make derivative works of

their own creations, as well as reproduce and copy them and distribute them.


At whatever point you were counseled concerning the legitimacy of your new

scheme to acquire songs, you merely delegated the matter to your huge legal

department, where you hoped to devise other schemes to allow you to keep the

property you have stolen indefinately. Perhaps, only a few authors will file suit. Perhaps many will.

Certainly this type of crime seems innocently sinister and business-like, as long as the authors cant afford counsel, and as long as you spend massive dollars promoting and advertising the stolen products and investing in defendant biased law firms.

Your ingenuous methods of obtaining songs without paying original authors, but instead making them pay a fee to send songs to you, caused you to have many rallys at the stock market, as well as many songs to choose from for your massive cast of artists, for many years into the future. You have for a time done well by your boards of directors since you have acquired original melodies and chorus lines that are priceless, from the naïve and gullible original authors of this world.

However, crime, in any form has a sinister way of growing like a weed, until your fine organization is become choked with the taint of the single sinister thought concerning author's original works. Two wrongs don't make it right. So, now you must fight. You must fight to re-legitimize your non-stolen songs as well as the stolen ones. Your organisation is become sick with the wieght of deceit and deception of a small few, and perhaps, only this action at law can compel your

enterprise or organization to consider legitimacy and fairness in the areas of song ownership and exploitation.

Original authors do not grow on trees. Their works indeed come from mysterious places and mysteriously work their ways into the minds and hearts of the people of this world. As lofty and ambitious as your song taking plans seemed, they must be called into account as authors seek redress for the many song properties you obtained unlawfully, only to exploit for commercial advantage and private financial gain.

This practice is causing the unjust enrichment of the conglomerates at the expense of authors who are not being compensated. Some independent authors, like this plaintiff, through "fear of economic loss" and a dismal future in the entertainment business if they antagonize the conglomerates, are duped into exposing their entire catolog of original song materials, in the hopes that the conglomerates will like the author and his/ or her works, and allow the material a fair share in the marketplace and not be merely stolen, especially when the conglomerates suddenly advertise an "openness" never before seen in their ploys to obtain songs.

It is an industry fact that record conglomerates traditionally never talk to or deal with individuals or companies directly. To share songs with them, they claim

7

hypocritically, that one needs an attorney or other recognized agent to represent

songs when seeking to be signed by their labels. On the flip side of this

contradictory industry policy, you have "**Inside Sessions**" claiming you can send

your songs to them, and connect with industry icons for merely $200.00 without

an attorney or other agent.  This proposition is hypocritical as well as evidence of a

"smoking gun" in the entertainment business. **(See Exhibit D & Exhibit O, pg.**

**8)).**


When authors and owners learned that UMG **(Universal Music Group)**, had

created a company called "**Inside Sessions**" as a vehicle to expose authors works

without an attorney or other agent, they jumped at the chance and literally "**threw**"

songs and original content at the conglomerates doorsteps, regardless of the fee.


Granted, many authors and creators of original content are amatuer and no match

for the skills of professionals already on staff at the conglomerates many locations.

However, a small few independent authors create and cast amatuer artists to

perform songs they create, and sell their products alongside the conglomerates.

What results is what this case is made of: Unfair Competition, Fraud, theft,

Extortion, Racketeering, Copyright Infringement and Missappropriation of Trade

Secrets.

8

Hopefully the buck stops here and "**Inside Sessions**" will no longer be allowed to exist in its current form of a pseudo-legitamate business operating and acting for the criminal purposes of a few individuals and entities who would break the law on such sinister levels.

## NATURE OF THE ACTION

1.  Plaintiff brings this action to stop defendant's brazen extortion and theft of copyright protected expressions being distribution over the Internet and retail stores worldwide, for profit, of the actual and fixed chorus lines of plaintiff, which were designed for the same markets served by the defendants.

2.  Plaintiff owns the right to make "**derivative works**" of his original songs and no one else has that right. Yet, plaintiffs paraphrased derivatives have appeared in many currently popular artist albums, and one song even appeared as the theme song in one of the most successful and critically acclaimed motion pictures representing this genre of music in 2005. **(Hustle & Flow, Paramount Pictures/Atlantic)**.

3.  The defendants have created an "original hit song machine", which they surreptitiously own and operate, and which extorts, infringes and exploits author's original works, thereby collecting them from blind and duped authors, to use wherever the need arises.

9

4.   Such a piratical and counterfeit operation is being operated under the authority, appearance and full support of legitimate businesses.

5.   Defendants have unlawfully made derivative works of the chorus lines of all plaintiffs complained of works in an effort to diminish the force of plaintiffs chorus lines in the same marketplace, since plaintiff also makes and sells CDs, as well as diminish the value of the songs overall appeal by using an already hot artist on the conglomerate roster, while plaintiff feebly tries to continue selling the diminished originals in the streets.

6.   This practice is designed to replace one company's or songs market identity and prescence over another's, competitively.

7.   Thus, after creating the unlawful derivative work, defendants then designate certain or fledgling **superstars** to perform and/or produce these coveted but stolen works, thereby introducing millions of falsely created products, into commerce, while full knowing that only plaintiff can make derivative versions of any of its works.

8.   Defendants unlawful and unscrupulous methods of instantly obtaining such high-powered and original song content, is causing and continues to cause this plaintiff grave and irreparable harm, as well as myriad other authors who have willingly given their works to the "**Inside Sessions**" enterprise which is at issue here.

9.   Such author's works, including the nearly **100 songs** from this plaintiff, are merely placed on the shelf and used by the defendants whenever the need or the artist arises, plain and simple.

10.  Because this plaintiff's works are well known to be constantly in demand in the streets of any urban area, the highly commercial literal expressions

emanating from plaintiff and his artists became highly desirable. **(See Exhibit E)**.

11. Kanye West, a typical/defendant person, actually brags about using others works without permission. **(See: Exhibit R and Exhibit S))**.

12. Such naiveté or bravado on the part of Mr. West represents the nonchalant legal attitude and lack of knowledge of the industry giants who feel they can actually re-write the laws of copyright.

13. Mr. West, as well as this entire cast of defendant persons employed by the enterprise must be adequately advised, admonished and halted and these perpetrators educated and reprimanded concerning these coveted rights of original authors.

14. This case will restate the fact that:

> **"The most commercial part of any song is proprietary to its creator, and only he can authorize derivative works or their exploitation, and not the likes of Kanye West or Inside Sessions or UMG, WMG or VIACOM".**

## JURISDICTION AND VENUE

15. This is an action for Copyright Infringement arising under the Copyright Act **17 U.S.C. 101 et seq., 17 U.S. C. 104 et seq., 501 & 506 et seq., 18 U.S.C. 1962(c), 18 U.S.C. 1964(d) & 18 U.S.C. 2318**, this court has exclusive jurisdiction under **28 U.S.C. 1338(a), 28 U.S.C. 1331**, and with regard to the Lanham Act, jurisdiction is based on **15 U.S.C. 1122, 17 U.S.C. 408, 409, 410, 411, 43(a) 1125 & 15 U.S.C. 1051**.

16. Venue is proper in this district as well as personal jurisdiction over the defendants in this district under **28 U.S.C. 1391(b)(1)(c) & (d) & 28 U.S.C. 1400(a)**, in that all infringing articles can be found in this district and defendants can therefore be found as well.

17. All defendants are hereby presumed to have the necessary minimum contacts with this instant forum and others, nationally and internationally so as to justify being hauled into court anywhere.

## PARTIES

18. Plaintiff, Robert R. Prunté, is a plaintiff "person" under **18 USC 1964(c)** and a citizen of the state of Maryland, as well as the sole owner of the coveted and copyrighted expressions allegedly purloined by the defendants. Robert R. Prunte' and Karen Pate are also partners in a business creative concept known as a "Strategic Alliance", which describes a "Silent Partnership" music publishing company/business known as Yoworld Music and Rowdy City Records, controlled by and for Ms. Pate and Mr. Prunte' for fulfillment of its directives and objectives.

19. Plaintiff has applied for full copyright registration certification of songs relative to this action, even though a certificate has been issued for (1) one of the songs, (We Got It Poppin), and plaintiff also has pre-registered the songs as well, according to the Intellectual Property Protection Act, (IPPA) and The Family Entertainment and Copyright Act, (FECA), since the Register of Copyrights considers them high-risk

properties that usually become the subject of copyright infringement actions. **(See: Exhibit T)**.

20. Defendant, Warner Music Group, is a Delaware corporation with a principle place of business in California and New York. Warner Music Group is a defendant person under **18 USC 1962(c)** and **18 USC 1964(d).**

21. Defendant, Viacom International, is a Delaware corporation with a principle place of business in California and New York. Viacom International is a defendant person under **18 USC 1962(c) and 18 USC 1964(d)**.

22. Defendant, Interscope Records is a defendant person and subsidiary of Universal Music Group as well as defendant person under **18 U.S.C. 1962(c)** and **18 U.S.C. 1964(d)**.

23. Defendant, Universal Music Group, is a Delaware corporation with a principle place of business in California and New York. Universal Music Group is a defendant person under **18 USC 1962(c)** and **18 USC 1964(d)**.

24. Defendant Ted Turner & Ahmet Ertegun are the chief executives of Atlantic Music Group and Atlantic Records & Warner Chappel Publishing respectively, and are defendant persons according to **18 USC 1962 (c) & 18 USC 1964(d)**.

25. Defendant Adam Fischell, is an employee and executive officer of Atlantic Records, and also a defendant person under **18 U.S.C. 1962(c)**.

26. Defendant Dino Delvaille is an employee of Universal Music Group as well as executive officer with Universal Music Group, and also a defendant person under **18 U.SC. 1962(c) & 18 U.S.C. 1964(d)**.

27. Defendant, Geoff Siegel, is an employee with Universal Music Group, as well as executive officer of the firm. Mr. Siegel is also a defendant person under **18 U.S.C. 1962(c) & 18 U.S.C. 1964(d).**

28. Defendant Summer Redstone is CEO of Viacom and also a defendant person according to **18 USC 1962(c) & 18 USC 1964(d)**.

29. Likewise BET, MTV & VH1 are defendant persons according to **18 USC 1962(c) & 18 USC 1964(d)** as well as Paramount Pictures, as subsidiaries of Viacom International.

30. Defendant(s) Zach Horowitz and Nick Henry are chief executives of Universal Music Group and are defendant persons according to **18 USC 1962(c) & 18 USC 1964(d)**.

31. Inside Sessions, Def Jam Music Group, Interscope, G-Unit and Cash Money Records, being subsidiaries of Universal Music Group, are also defendant persons under **18 USC 1962(c) & 18 USC 1964(d)**.

32. Defendant, Kanye West is an employee or other agent of the alleged "enterprise", and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d)**.

33. Defendant, Brian Wittmer is an employee of Universal Music Group as well as executive and also a defendant person under **18 U.S.C. 1962(c) & 18 U.S.C. 1964(d)**.

34. Defendant, Brandy Norwood, is an employee of the alleged enterprise and Atlantic Records & also a defendant person under **18 USC 1962(c) & 18 USC 1964(d)**.

35. Defendant, Lloyd Banks, is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d)**.

36. Defendant, Lil Wayne, is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d)**.

37. Defendant, Roy Jones, Jr., is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d)**.

38. Defendant, Eminem, is an employee or other agent of Universal Music Group and Interscope Records and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d)**.

39. Defendant, T.I., is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d)**.

40. Defendant, The Ying Yang Twins, are also employees or other agents of Universal Music Group and the alleged enterprise and also defendant persons under **18 USC 1962(c) & 18 USC 1964(d)**.

41. Defendant, Fat Joe, is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d)**.

42. Defendant, Ludacris, is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under 18 USC 1962(c) & 18 USC 1964(d).

43. Defendant, 50 Cent, is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d).**

44. Defendant, Baby of Cash Money Records, is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d).**

45. Defendant, John Legend, is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant person under **18 USC 1962(c) & 18 USC 1964(d).**

46. Defendant Rich Christina is an employee and executive of Atlantic Recording Group as well as a defendant person under **18 U.S.C. 1962(c)** and **18 U.S.C. 1964(d).**

47. Defendants Shawn (Jay-Z) Carter and Damon Dash are employees, agents of Universal Music Group and subsidiary owners of Def Jam and Roc-A-Fella Records, and are also defendant persons under **18 U.S.C. 1962(c) & 18 U.S.C. 1964(d).**

48. The above named defendant persons are hereafter referred to collectively as "defendants", and each defendant is, and at all times averred herein, alleged to be a party to the unlawful activities, complained of herein, directly and or indirectly, and thus conspired with and or acted in concert or in combination with each of the other defendants, and has aided or abetted such other defendants, and or has acted as an agent for each of the other defendants both complimentary and peripherally, either committing

criminal acts or thereby providing support under a cloak of legitamacy, with respect to the actions and matters described within this complaint.

# **BACKGROUND AVERMENTS**

49. On April 27, 2005, President George Bush signed the Family Entertainment and Copyright Act (FECA), Pub. L. No. 109-9, 119 Stat. 218. Title I of FECA is the Artists Rights and Theft Prevention Act of 2005, or "ART", which among other things, addresses copyright infringement of works committed prior to their authorized commercial distribution, or pre-release infringement. It includes, in sec. 103 new criminal penalties for certain acts of pre-release infringement. Section 104 directs the Copyright Office to conduct a rulemaking proceeding to establish a procedure for pre-registration of unpublished works that are being prepared for commercial distribution.

50. Please see plaintiffs pre-registration of unpublished works being prepared for full commercial distribution, but for sake of defendants alleged infringement. **(See Exhibit T)**.

51. Defendants allegedly obtained pre-release versions of plaintiff's songs being prepared for full commercial distribution, before such distribution ever took place, and then unlawfully exploited the same.

52. Copyright owners thankfully persuaded Congress that the existing rules making copyright registration a prerequisite for suit for infringement of United States works, and a prerequisite for awards of statutory damages

17

and attorney's fees are unduly burdensome on plaintiffs seeking relief against pre-release infringement in civil suits for copyright.

53. A commercial song is a complex work composed of discreet literary components. Everyone knows that any song, of any genre, always contains a "**most commercial part**", or a "**chorus line**" that determines the force and effect of the songs literal payoff to the listener.

54. A hot chorus line may mean the difference between the success or failure of a commercial song. When someone chooses to lift the chorus lines from the works of original creators, it becomes obvious that some individuals have unraveled the formula that made the original chorus line so hot in the first place, while at the same time intentionally de-valuing the original authors work.

55. In their drive to maintain the attention of huge audiences, this enterprise, has created an "**open academy type hit factory**", as well as puppet/slave-like actors known as "**contract/ recording artists/employee/slave lackeys**" who are cast to appear in starring roles performing stolen works.

56. After creating the unlawful derivative work, the enterprise then distributes and exploits the project as if it has gone through the proper and traditional evolution of popular song creation, production and exploitation.

57. After unlocking the secrets of the song, so to speak, these unscrupulous agents and operators of the enterprise, then unlawfully counterfeit the derivative works of the original copyright owners, without compensating them, or even returning their original and now mutilated works.

58. Although the complained of enterprise recently ceased active operation of the "**Inside Sessions**" program via the Internet, the firm still exists and is

doing business.  **(See Exhibit G).**  This equals a strong intimation that they intend to reactivate it on Internet after resolving the issues of this case and others, and resurrect the professional copyright infringement services of "**Inside Sessions**" at a later date.

59. In doing the acts averred herein above, the defendant persons and defendant enterprise and each of them, have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which has been, among other things to serve each of these defendant persons and the overall enterprise' own economic benefit by <u>knowingly</u>, <u>willfully</u> and <u>intentionally</u> re-creating derivative works from copyrighted songs.

60. Thus, each of these defendants knowingly, willfully and intentionally has committed the herein complained of acts either passively or actively, directly or indirectly and have thusly committed the acts herein above described in furtherance of the conspiracy, common enterprise, and common course of conduct.

61. Therefore, each defendant actively participates in, facilitates, materially contributes to, and encourages the infringing activities of each other defendant person in compliment of the overall enterprise, and each defendant greatly profits from those activities.  Plaintiff and countless others are being irreparably harmed by the conduct of the defendants, and each of them, and has further suffered significant damages for which each defendant person is liable in varying degrees.

# FIRST CLAIM FOR RELIEF
# COPYRIGHT INFRINGEMENT

62. Plaintiff repeats and reavers each and every averment contained in paragraphs 1 through 61, inclusive, and as if fully set forth herein.

63. Plaintiff is alleging in this complaint that he knows of at least (18) eighteen original songs, owned by him, that are allegedly being infringed by the defendant companies and their cadre of artists.

64. The titles of such songs are: **"Everybody's Talkin", "Smoke, Drink, Cuss Fight", "Shoot To Kill", "Im A Maniac", "Tear Da Roof Off", "Kings In The City", "Im So High", "Slow Neck", "Wish A Mutha Fuggah Would", "We Got It Poppin", "Call Me", "Boody On Ya Back", "Strippa Girl", "What Time Is It", "Who Dat Is", "Fire In Tha Hole", "Ma Streetz" & "Ridin Dirty"**.

64. The alleged songs are believed to have been infringed during the years of 2004, 2005 and into 2006, based upon plaintiff's information and belief. Jurisdictionally speaking, the only "official registration" certificate issued is for the song "**We Got It Poppin**", a song allegedly infringed in this bundle of songs herein complained about.  As such, the song is part of a compilation and may be sufficient to permit the status quo of this case until such time as the other works registration certificates are issued.

65. The Second Circuit held, in ***Morris v. Bus. Concepts, Inc.*, 259 F.3d 65, 68 (2d Cir. 2001),** that where an owner of a collective work also owns the copyright for a constituent part of that work, registration of the collective work is sufficient to permit an infringement action of the constituent part. Similarly, in 1997, a district court in Kansas held that registration of a derivative work is sufficient to allow an infringement claim based on the copying of material, whether newly added or contained in the underlying

work. *In Re Indep. Serv. Orgs. Antitrust Litig,* **964 F.Supp. 1469 (D. Kan. 1997);** *see also* ***Foxworthy v. Custom Tees, Inc.,*** **879 F.Supp. 1200, 1218 (N.D. Ga. 1995) (holding that "preexisting materials may be subject to copyright protection under the umbrella of a compilation copyright.").** The Court specifically held:

> **"We adopt this view and reverse the district court, finding that because *Imageline* owned copyright in *SuperBundle* and Master Gallery and in the underlying works of each, its registration of Super- Bundle and Master Gallery was sufficient to permit an infringement action on the underlying parts, whether they be new or preexisting."**

## CURRENT LEGAL STANDARDS OF COPYRIGHT ANALYSIS OF "SUBSTANTIAL SIMILARITY"

66. The two leading tests on substantial similarity came from the Courts of Appeals on both coasts. The Second Circuits test required a showing of "(a) that the defendant copied from the plaintiffs work, and (b) that the copying...went so far as to constitute improper appropriation"**...(quoting Arnstein, 154 F. 2d at 468)**. Expert testimony is thus admissible in the first step, but not in the second, since substantial similarity must be judge according to the perceptions of the ordinary reasonable person.

67. The Ninth Circuit articulated a similar test in **Sid & Marty Kroft Television Prods., Inc. 562 F. 2d at 1163-64**. The first step was called the "Extrinsic Test". Experts are permitted to assist the Court or Jury in determining whether the defendant copied the plaintiff's work (as opposed to merely using the ideas reflected in it). In the second half of the analysis,

21

the "Intrinsic Test", the Court or Jury must determine if an ordinary reasonable person would find the works substantially similar, without expert guidance.

68. In **Kohus v. Mariol, 328 F. 3d 848 (6ᵗʰ Circuit 2003)**, the 6ᵗʰ Circuit Court of Appeals also considered **Feist Publications Inc. v. Rural Television Services Co., 499 U.S. 340**, **348 (1991),** the Court held that copyright protection extended only to original portions of the plaintiffs work. Accordingly, before comparing similarities, a court must filter out elements of the plaintiff's work that are unoriginal, **(citing Kohus, 328 F. 3d at 853)**.

69. To reconcile these competing differences of Circuit Courts of Appeals opinions, the **Kohus Court** turned to the **D.C. Circuit, in Sturdza v. United Arab Emirates, 281 F. 3d 1287, 1295, 1296 (D.C. 2002)**, articulating that this Court also used a "two-pronged" analysis. The first step involved identifying the portions of the plaintiff's work that were protectible under Copyright Law.

70. The second test focused on whether the defendant's work was substantially similar to the protectible elements in the plaintiffs work. The **Kohus Court** applied the first step to "filter out the unoriginal, unprotected elements— elements that were not independently created---and that possess no minimal degree of creativity.. **(Kohus 328 F. 3d at 855).** The primary objective was to separate expression of ideas (which are protectible), from the ideas themselves, (which are not). **(Mazer v. Stein, 347 U.S. 201).**

71. The 6ᵗʰ Circuit then provided a list of elements that should be filtered out, such as portions of the work required by function, scenes a faire, or portions of the work dictated by business practices. **(Citing Concrete Mach. Co. v.**

**Classic Lawn Ornamentals, Inc., 843 F. 2d 600, 606 (1st Circuit, 1988) & Computer Management Assistance Co., v. Robert F. DeCastro, Inc., 220 F. 3d 396, 401 (5th Circuit 2000).**

72. In examining the second step, the court determined that the ordinary observer test should focus on the "intended audience". The 6th Circuit found that this test addressed works the general public would purchase.  Thus, it was determined that expert testimony will generally be required to demonstrate the factors important to a specialized audience.  **(Dawson v. Hinshaw Music Inc., 902 F.2d 731, 733 (4th Circuit 1990)).**

73. Plaintiff is the owner of all exclusive rights in the above songs, which are at issue.  As such, the songs at issue were in a test market process at the label and the artists, as well as the songs, were being cast for appeal, and tested in several urban cities in hopes of attracting major label interest, and eventually mass exploitation. Many songs were given away, and some albums were sold for a five-dollar donation.

74. Each artist who performed each song for plaintiff did so with the understanding that the songs were being test marketed for possible mass exploitation by the major labels.  Therefore, each artist signed a distribution/management agreement with plaintiff prior to the test marketing of any song whatsoever. **(See Sample Artist Agreements, Exhibit U).**

75. Plaintiff is the owner of the exclusive rights relevant to the herein named songs as sole or prime publisher of the same.

76. The copyrights have been applied for, and pre-registration of (18) eighteen songs has also been effected with regard to the songs in question, due to

them being deemed copyrighted materials considered to be at high risk for infringement by the Register of Copyrights.  **(See Exhibit T and 17 U.S.C. 408, 410 & 411)).**

77. Plaintiff, Robert R. Prunté, has the exclusive rights among other things, to reproduce, make derivative works of, adapt and distribute, as well as publish and copy the resultant creations which are solely proprietary to him.

78. The defendants did acts of paraphrasing to create derivative works of plaintiff's original works, merely to unlawfully exploit the songs with the help of big named acts already in their employ.  Such creation of derivative works of plaintiff's works is unlawful and implicates the defendants in massive infringements of plaintiff's exclusive rights under copyright.

79. In order to view and or possess the original song material, the defendants conduct an operation known as "Inside Sessions", which builds confidence in authors and eventually gets the chance to critique the author's works, while in reality taking the songs for their own unlawful goals.

80. Plaintiff has no idea at this point how many songs are involved with the massive theft of defendants, or when and where all such infringements have occurred, without the help of the discovery process.

81. The United States Copyright Office's "Pre-Registration" code for the allegedly infringing songs of the defendants is, **1-3912351.  (See Exhibit T)**.

82. Plaintiff seeks no attorney fees or statutory fees due to the plain wording of the statute with regard to untimely pre-registering of the works in question. However, an appropriate application for registration has been filed, and the certificate for those (18) eighteen songs is forthcoming.

24

83. Defendant enterprise <u>and</u> defendant persons, without the permission or consent of plaintiff, have re-created unlawful derivative works from plaintiff's original works and reproduced them, adapted them and distributed and exploited the works unlawfully, within and without the territorial limits of the United States.

84. These infringements have occurred whenever, inter alia, defendant persons copied plaintiff's songs and re-created derivative works by paraphrasing the chorus lines.

85. The infringement of each of plaintiff's rights in and to each of the copyrighted works constitutes separate and distinct acts of infringement.

86. The foregoing acts of infringement have been therefore willful, intentional and purposeful, in flagrant disregard of and indifference to the rights of plaintiff specifically, and authors in general.

87. As a direct and proximate result of defendants infringement of plaintiffs copyrights and exclusive rights under copyright, plaintiff is entitled to damages as well as all profits of the defendant persons pursuant to **17 USC 504(b)** for each infringement.

88. Plaintiff is further entitled to attorney's fees and full costs pursuant to **17 USC 505**, and permanent injunctions prohibiting further infringements of plaintiff's copyrights and exclusive rights under copyright.

## DIRECT ACCESS TO PLAINTIFF'S SONG PROPERTIES

89. The defendant persons, solely for the sake of the enterprise, gained access to plaintiff's entire vault of original works in the following manners:

a. **Inside Sessions**, for a fee, allows artists and authors to send in original songs in return for a professional critique from some high-level industry icon. **(See Exhibit A)**

b. Plaintiff sent Inside Sessions several demo type CD's as well as a double CD set with (38) thirty-eight songs we were using to travel the country with and sell via street teams. **(See Exhibit B).**

c. Executives at the enterprise and employee/defendant persons encouraged plaintiff to continue to send in original songs. **(See Exhibit C)**

d. Plaintiff has given concerts where original cd's were given away and/or sold, as well as street team events where major cities were exposed to plaintiff's expressions. **(See Street Team and concert: Exhibit(s) F & H).**

## DIRECT EVIDENCE OF COPYING

90. Kanye West, a very visible member of this association in fact individuals, has admitted the employment of unlawful copying practices when creating his so-called original songs. **(See Exhibit R & S).**

91. Aside from the admission of Mr. West concerning unlawful copying as a means of "learning how to do it", the huge degree of access also implicates the defendants circumstantially of directly copying plaintiffs "chorus lines" in order to create the allegedly infringing derivative works.

## EXPERT TESTIMONY NECESSARY

92. In this case, expert testimony is needed in order to separate or distinguish between the authors "protectible expression" and the "unprotectible ideas", "concepts" or "themes" that he or she wishes to convey. This is necessary since defendants allegedly copied "<u>the most original and commercial parts of plaintiffs songs</u>" or, the <u>Chorus Lines</u>" of plaintiffs coveted works.

93. Defendants have, by their own admissions, requested plaintiff to <u>continue</u> sending his original songs in to their offices. **(See Exhibit, B, C, D, J, K, L, O & Q)**. Thus, defendants had ample time to view the songs. Access need not be proven.

94. However, since all copyrighted works must be broken down into their base elements, the defendants will also have to admit that the only words at issue are the "Chorus Lines" of the works at issue. **(See Fonar Corp. v. Domenick, 105 F. 3d, 99 (2d Cir. 1999)**.

95. Defendants thus cannot show any evidence of independent creation, due to the high degree of access shown here by undisputable facts. **Novak v. National Broadcasting Co., 752 F. Supp. 164, 170 (S.D.N.Y. 1990) (Sweet, J.) (Granting summary judgment to defendant on the issue of prior independent creation)**.

96. Thus, since "chorus lines" are always considered "protected materials", it can be inferred and assumed that protected elements were allegedly taken from plaintiff's works. An essential element of a copyright claim is unauthorized copying of the protected material. **<u>Laureyssens v. Idea Group, Inc.</u>, 964 F.2d 131, 139 (2d Cir. 1992)**.

### Examples of <u>Probative</u> Similarity of Ideas and Expression

97. "Probative Similarity of protected expressions is indeed a different phrase than "Substantial Similarity" of protected expression.  Probative similarities are determined after dissection of protected and unprotected ideas and expressions.  Substantial similarity is determined after the former decision has been made.

98. Thus, this case is not about the <u>ideas</u> relating to the works in question, but the actual <u>expression</u> of those ideas found within the "chorus lines" of the complaining works.  **(See: Bell v. Blaze Magazine, 58, U.S.P.Q. 2d 1464 (S.D.N.Y. 2001)**.

99. The short phrases which make up plaintiffs chorus lines of its original songs, are original and exhibit the requisite and statutory creativity to warrant protection, and the use of such protected expressions amounts to infringement of plaintiffs right to make derivative works of the works it creates.

100.    Short phrases are definitely actionable.  In a 2000 case, the author of a book, "Wall Street Money Machine," claimed that motivational speaker *Anthony Robbins* used a few of his phrases in a "<u>Financial Power</u>" manual, given out at a Robbins seminar. (The phrases were based on metaphors comparing investing to driving a taxi.) The jury determined that Cook had a valid copyright and that there was infringement on two of the four copied phrases: "**<u>Money is made on the Meter Drop</u>**" and "**<u>No one I know has</u>**

28

**come up with a name for the type of investing I call `Rolling Stocks.' It works on stock that roll up and down in repeated waves. . . . Some roll fast and some slow"....***Cook v. Robbins,* **232 F.3d 736 (9th Cir. 2001). &** *Shaw v. Lindheim,* **919 F.2d 1353, 1361 (9th Cir. 1990).**

101.    Defendants allegedly have quoted or paraphrased the sequence of creative expression that includes such phrases which plaintiff terms "chorus lines". **(See:** *Salinger v. Random House, Inc.***, 811 F.2d 90, 98 (2d Cir. 1986)**.

102.    Therefore, if phrases used by plaintiff for commercial purposes to express commercial chorus lines are in turn used by defendants in a derivative form or otherwise hijacked for a blatant commercial use-for example, using "**E.T., Phone Home**" on drinking mugs, courts are likely to find infringement. *Universal City Studios v. Kamar Industries, Inc.***, 217 U.S.P.Q. (BNA) 1165 (S.D. Tex 1982) &** *Klitzner Industries, Inc. v. H. K. James & Co.***, 535 F. Supp. 1249 (E.D. P.A., 1982)**.

103.    This case represents and seeks copyright protection for small groups of words, which make up the "most commercial part" of a commercial song. The clever arrangements of the words are what make up 100% of the plaintiffs protected expression. **(See:** *Brilliant v. W.B. Productions, Inc.* **C)**. *Nichols v. Universal Pictures Corp.* **45 F.2d 119, 122 (2d Cir.) (Decision by J. Learned Hand  & Heim v. Universal Pictures.**

**92. Original Song Title (1): "Everybodys Talkin Bout Us" Performed By David Hebb (Chorus Line)**

"Everybody's talking bout us, they see its me you trust, and guys be tryin ta get with you but they cant do a thing for you, Everybodys

29

talkin bout us, they say its only lust, but I am yours and you are mine, this love will last our whole lifetime"…

### Derivative Song Title (1): "Let's Talk About Our Love". Performed By:

### Brandy Norwood and Kanye West.(Chorus Line)

"The more they talk about our love, the more they make it obvious, the more they seem so envious, how can they talk about us, when they don't know one thing about, theyre just runnin their mouf, so all we do is tune them out"…

### 93. Original Song Title (2) "Smoke, Drink, Cuss, Fight". Performed By The Rowdy Boyz

"We gone smoke, drink, cuss, fight, stab, shoot cuz we wildin tonight, we gone roll the dice, wit cash in the pot, somebody getting rocked, somebody gettin dropped".

### Derivative Song Title (2) "I Smoke, I Drink". Performed By Roy Jones and The Body Head Bangers

"I smoke I drink, Im supposed to stop but I cant, Ima dog, I love hoes, and Im addicted to money cars and clothes"

### Derivative Song Title (2) "Smoke By Maself". Performed By The Ying Yang Twins.

"I smoke by maself, drink by maself, fuck these hoes by ma gotdamn self".

### 94. Original Song Title (3) "Shoot To Kill". Performed by The Rowdy Boyz

"If I gotta shoot I shoot ta kill, gotta keep it real, send them threats, gonna get wet, me and ma homeys packin steel, If I gotta shoot I shoot ta kill, glock is concealed, loose lips sink ships, leavin em slumped behind the wheel, If I gotta shoot I shoot ta kill, up on the hill, thugs die, mamas cry, people always tryin to steal, If I gotta shoot I shoot ta kill, dey wont I will, keep a clip, neva slip, gotta make sure they pay them bills"…

**Derivative Song Title (3) "Eminems Battle Song" Performed By Eminem**

"If I cant shoot you, Ima hafta kill you by spittin, ballin motha fuckas, my ruckas aint written, when my bullets miss, ma words keep hittin, if you like pain, then that's what your getting"…

**Derivative Song Title (3) "Welcome To The South".  Performed By YoungBuck**

"Gold grills, coupe devilles, sittin on 20 20's, the dirty dirty baby, show em how the south do, we pop pills, shoot to kill, you know what we bout, and on behalf of g-unit, welcome to the south".

**95. Original Song Title (4) "Im A Maniac" Performed By The Rowdy Boyz**

Ima maniac, I cant keep out of the zone, I spend my nights on the phone, my triger fingas on the chrome, Ima maniac, nobody knows but me, and everywhere that I go, there be demons callin me, Im a maniac, my mind is almost gone, these streets is my home, the only thing that I own, Ima maniac, and quick to lose control, I got a hole in my soul, its filled with diamonds and gold."

**Derivative Song Title (4)  "Break Bread" Performed By Ludacris**

"Heyyy, Im a maniac, go and tell the whole world mr. pain is back, so go get them thangs out, you better lock up your house, and tell the cops they let the animals out".

**96. Original Song Title (5) "Tear The Roof Off".  Performed By The Rowdy Boyz"**

"Lets tear the roof off, make it jump, make it pump, make it crunk through the trunk".

**Derivative Song Title (5) "We On Fire" Performed By Lloyd Banks**

"Tear the roof off this mothafucka, light the roof on fire, we getting loose up in this mothafucka, light the roof on fire"…

### 97. Original Song Title (6) Kings In The City" Performed By The Rowdy Boyz

"We the kings in the city rock the block and the club, and everywhere that we go, they be showin us love, we the kings in the city, sportin hoodies as crowns, from a long line of hustlers, and we all get down, we the kings in the city, makin money wit mikes, cruisin through your town, on fancy motor bikes, we the kings in the city, crushin lords and princes, makin midnight moves with mercedes benzes".

### Derivative Song Title (6) "Im A King" Performed By T.I.

"Im a king, bank rolls in the pockets of my jeans, you pussy niggas couldn't see me in your dreams, im a king, top topic of all your magazines, im a king, rememberI can get your block knocked off, im a king, bentley coupe with the top chopped off, im a king, im connected nationwide, but in the south im a king, just respect it and keep my name out your mouth".

### 98. Original Song Title (7) "Im So High". Performed By The Rowdy Boyz

"Im so high, higher than the clouds in the sky, so high I could kiss the clouds in the sky".

### Derivative Song Title (7) "So High". Performed By John Legend

"Ohh this feels so crazy, how this love is blazing, baby we are so high, walkin on cloud nine, you got me up so high, so high, my shoes are scraping the sky, so high, you got me so high, my shoes are scraping the Sky"…

### 99. Original Song Title (8) "Slow Neck" Performed By The Rowdy Boyz

"Can you slow neck, to your knees will you drop, take the wood in yo hands lick it like a lollypop, can you slo neck sixty eight sixty nine, drink it dry to the bone like yo favorite wine, gime slow neck strawberrys on ice, if

you go down once will you go down twice, gime slow neck, and don't move too fast, make me feel so good that I want it to last".

### Derivative Song Title (8) "Slow Motion". Performed By Juvenile

"Skull, slow motion for me, slow motion for me, move it slow motion for me, slow motion for me, slow motion for me, move it slow motion for me, uh, I like it like that, she workin that back, I don't know how to act, slow motion for me, slow motion for me, slow motion for me, move it slow motion for me".

## 100. Original Song Title (9) "Wish a MuthaFugga Would." Performed By The Rowdy Boyz

"We wish dem muthafuggas would, try ta come on this block, cause we them real thugs thas hard to stop, we wish dem motha fuggas would, try to come to tha table runnin a stable, just because they think they strong and they able, we wish them mothafuggas would."

### Derivative Song Title (9) "The Heat". Performed By Lil Wayne

"I shoot arm leg, leg, arm head, the heater burner bruiser on my hip this year, I shoot, arm leg, leg, arm head, I wish a motha fugga would trip this year".

## 101.    Original Song Title (10) "We Got It Poppin". Performed By The Foundation

"Who got it poppin, we got it poppin, shorty on the dancefloor an she aint stoppin, who got it poppin, we got it poppin, all the way to brooklyn shorty got it locked down, who got it poppin, we got it poppin"...

### Derivative Song Title (10) "Lets Get It Poppin". Performed By Fat Joe

"Its 2 up in the mornin girl, and the dj playin that song, now what chu gone do, im gon get it poppin, what chu gone do, Im gon get get get it poppin"…

102.    The above examples of derivative versions of plaintiff's original songs, namely, the chorus lines allegedly re-created into derivative works by the defendants did not occur by mere accident, chance, or independent creation, since a high degree of access has been shown, and because the songs occupy the same hip hop marketplace, targeted for the same hip hop audience and because the defendants have taken "**the very heart of plaintiff's original hip hop songs**", merely to exploit their success without compensating plaintiff.  This is unacceptable.

103.    Section 103 of The Copyright Act provides that the subject matter of copyright includes compilations and derivative works. Section 101 defines derivative works as:

**"A work based on one or more pre-existing works, such as a translation, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed or adapted.  A work consisting of editorial revisions, annotations, or other modifications, which, as a whole, represent an original work of authorship, is a derivative work."**

104.    "Likewise, when a study of (2) two writings is made, and it is plain from the study that one of them is not in fact the creation of the putative author, but instead has been copied in substantial part exactly or in transparent re-phrasing to produce essentially the story of the other writing, it infringes".  (*See: Nichols v. Universal Pictures Corp.*, 11930, 45 F. 2d 119 & *Warner Brothers Pictures v. Majestic Pictures Corp*, 2 Cir. 70 F. 2d 310, 311).

## COMPREHENSIVE NON-LITERAL SIMILARITY

105.    Thus, this case is based upon the comprehensive non-literal

similarities between the two works, although many similarities are literal

34

and near verbatim. **(See: 3 Nimmer 13.03 [A] [1])**, and since the allegedly

unlawful creation of derivatives was accomplished via the art of paraphrase,

thereby duplicating the "fundamental essence" or commercially complex

structure of plaintiff's work.

## ANALYSIS OF COMPLEX WORKS

106.    Because the issues here relate to the unlawful derivative work

creation by defendants of works as complex as commercial songs occupying

a hip hop/rap marketplace, of course expert testimony may be relevant in

terms of the **Federal Rules of Evidence 702** requirements.  The trier of fact

needs assistance in this case mainly because it is based on the theft of

"**Ebonic Literary Expressions**" emanating from hip hop/rap genre songs.

107.    Such Ebonic Language usage in both works could undermine the

efforts of any ordinary observer who is not familiar with hip hop/rap

expressions.  Nor should this court be expected to casually act as ordinary

observer in the midst of such a complex copyright case.  **(See: E.F.**

**Johnson Co. v. Uniden Corp., 623 F. Supp. 1485, 1493 (D. Minn. 1985),**

**Hubco Data Products Corp., v. Management Assistance Inc., 2**

**Copyright L. Rep. (CCH) 25,529, (D. Idaho Feb. 3, 1983) (enunciating**

**bifurcated test, but relying entirely on expert testimony); Midway Mfg. Co. v. Strohon, 564 F.Supp. 741, 752-53 (N.D. Ill 1983).**

108.    Therefore, plaintiff is alleging that the copyright in literary works can be infringed even where there is <u>no substantial similarity</u> between the works literal elements.  One can violate the copyright of a play or a book by merely copying its plot or plot devices.  **(See: Whelan & Associates v. Jaslow Dental Labs. 609 F. Supp at 1321-22).**

109.    The crude efforts of the defendants to give the appearance of "dissimilarity", are themselves evidence of copying.  **(See: Blume v. Spear, 30 F. 629, 631 (S.D.N.Y. 1887)**, thus, when the works in question are complex, like the commercial songs at issue here, expert assistance is vital. **(See: Fed. Rules of Evid. 702).**

## STRIKING SIMILARITY

110.    Plaintiff further alleges that the works bear a "striking similarity" when compared side by side which can only be explained by copying, rather than by coincidence, independent creation, or prior common source since there is a high degree showing of access as well as the allegedly infringing parts occupying the chorus lines of the works only. **(But see: Testa v.**

36

**Janssen, 492 F. Supp. 198, 203 (W.D. Pa. 1980), quoting Scratchborneo v. Arc Music Corp., 357 F. Supp. 1393, 1403 (S.D.N.Y. 1973) & Scott v. WKJG, Inc., 376 F. 2d. 467, 469 (7ᵗʰ Cir. 1967); Arnstein v. Porter, 154 F. 2d 464, 468, (2d Cir. 1946) & Scott v. Paramount Pictures Corp., 449 F. Supp. 578, 520 (D.D.C. 1978)**.

111.    Because all the complained of similarities occur within the "chorus lines" of the two works when compared, such a reality can never be considered coincidental, or accidental or independent creation, doubly so because (10) ten songs are at issue here with the same situation occuring time after time within the chorus lines of the songs in question all bearing the requisite "striking similarities".  **(See: Nichols v. Paramount Pictures Corp., 45 F. 2d 119, 122 (2d Cir. 1930), cert. Den. 282 U.S. 902, 51, S. Ct. 216, 75 L.Ed 795 (1931).**

<u>**INVERSE RATIO RULE APPLIES IN THIS CASE**</u>

112.    In **Sid & Marty Kroft Television Productions, Inc., v. McDonalds Corp.,** representatives from McDonalds Corp., only visited the headquarters of Sid & Marty Kroft once, in Los Angeles, to discuss engineering and design work, while full knowing they were not going to work with the Kroft's, they sought to infringe.  The Court decided the burden of proof for

a showing of substantial similarity is lessened where there is such a great

degree of access shown. **(See: Sid & Marty Kroft Tel. Corp. v.**

**McDonald's Corp.)**.

113.    The same should equally apply in this case since defendants

"appeared poised" to work with plaintiff and or plaintiff's songs in some

capacity, whether it was publishing, label deal or whatever.  The defendants

built the confidence of plaintiff merely to infringe, with utterly no intent to

work with the plaintiff or its songs, or its artists.  Defendants merely

provided the "ploy" concerning professional "critiques" of the material at

issue.

114.    Also, via U.S. Mails, the defendants encouraged plaintiff to continue

sending its hottest and most commercial songs to the defendants companies.

**(See: Exhibit(s) B, C, J, K, L, M & N))**.

115.    Such factors as those outlined above create an instant showing and

positive inference, as a matter of law, that the defendants experianced a

"**high degree of access**" to plaintiff's works, at least as high as McDonald's

mere single visit to the Kroft headquarters in the Kroft case.  **(But also see:**

**2 Nimmer 143.4 at 634; Fink v. Goodson-Toddman Enterprises, Ltd. 9**

**Cal. App. 3d 996, 1013, 88 Cal Rptr. 679 (1970) & Arc Music Corp. v.**

**Lee, 296 F. 2d 186 (2 Cir 1961) 2 Nimmer 141.2 at 613)**.

116.    Thus, the "striking similarities" appearing within the "chorus lines" of the works when compared, considering the "high degree of access", are arguably probative of copying instantly and immediately, as a matter of fact and law, absent any expert guidance whatsoever.  The infringement is obvious in terms of the complaining works began their life as a mere derivative or re-creation of plaintiff's original expressions.

## PLAINTIFF OWNS THE LITERAL AND NON-LITERAL EXPRESSIONS OF THE CHORUS LINES AT ISSUE, AND NO ONE ELSE.

117.    To constitute an invasion of copyright, it is not necessary that the whole of a work be copied, nor even a large portion of it in form or substance, but that, if so much is taken that the "value of the original" is sensibly diminished, or the labors of the original author are substantially, and to an injurious extent, appropriated by another, that is sufficient to constitute an infringement.

118.    Therefore, the test for infringement in this case occurs after an expert has explained the "probative similarities" between the ideas expressed between the two works, and an ordinary observer has observed the "striking similarities" occuring within the chorus lines of the works when compared,

and objectively considered whether plaintiff's works could be the source of defendants so-called commercial hip hip/rap song chorus lines.

119.     The method and style of plaintiff in expressing the chorus lines of the original works in question is proprietary solely to the plaintiff, and represents plaintiff's manner of creating hip hop/rap songs and expressing the resultant ideas.  **(See: Harold Lloyd Corporation 9 Cir. 162 F.2d. 354, 361, 363; Withol v. Wells, 231 F. 2d 550 & Benny v. Loew's Incorporated 9 Cir. 239, F.2d 532 536)**.

## THE VERY HEART OF PLAINTIFF'S ORIGINAL SONGS ALLEGEDLY HAVE BEEN TAKEN

120.     In this case, it is become obvious that defendants focused on "**the most important parts**" of plaintiff's original and commercial songs by their repeated taking of the chorus lines of plaintiff's songs only.  **(See: Harper & Row Publishers, Inc., v. Nation Enterprises, S.Ct 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588; Whether quoted verbatim or paraphrased, (See:  Nichols v. Paramount Pictures Corp., 45 F. 2d 119, 121 92d Cir (1930), cert. Den. 282, U.S. 902, 51 S. Ct. 216 75 L.Ed 795 (1931) & 3 Nimmer, Supra, 313.03 [A] at 13-20.1)**.

121.     In any event, defendants conduct threatens to cause, and is causing, and unless enjoined and restrained by this court, will continue to cause

plaintiff great and irreparable injury that cannot be fully compensated for or measured in money. Plaintiff has no adequate remedy at law. Pursuant to **17 USC 502**, plaintiff is entitled to preliminary and permanent injunctions prohibiting further infringements of his copyrights and exclusive rights under copyright or any other relief this court deems just and proper.

## SECOND CLAIM FOR RELIEF
## CONTRIBUTORY COPYRIGHT INFRINGEMENT

**By plaintiff against all defendant persons for Contributory and Vicarious Copyright Infringement, pursuant to 17 USC 501 Et. Seq.**

122.    Plaintiff repeats and reavers each and every allegation contained in paragraphs 1 through 121 as if fully set forth herein, and further alleges that, at all relevant times, each defendant person has engaged in, and on information and belief, continues to engage in the business of knowingly and systematically participating in facilitating, materially contributing to and encouraging the above described unauthorized creation of derivative works of plaintiffs original songs (as well as other authors), reproducing them, making adaptations, distributing and otherwise commercially exploiting them at will, thereby infringing plaintiffs copyrights, intentionally, and each defendant person had actual and constructive knowledge, either directly or indirectly, of the infringements committed by

41

and through the unlawful enterprise and its agent employees or such defendant persons merely provided necessary support.

123.    Furthermore, and at all relevant times, each defendant has derived substantial financial benefit from the infringement of plaintiff's copyrights by each defendant. Defendants have even <u>charged fees</u> to take possession of plaintiff's and other author's coveted and original works with their permission and consent. **(See: Inside Sessions, Exhibit B, and C & O).**

124.    At all relevant times, each defendant person has had the right and ability to supervise and or control the infringing conduct of each other defendant, whether directly or indirectly, from a criminality standpoint or a support standpoint.

125.    Defendant persons, through their active participation in the unauthorized reproduction and creation of derivative works and distribution and exploitation of plaintiffs property, thereby provided provisions of the means and facilities for unauthorized reproduction and creation of derivative works of plaintiffs property, thereby adapting and distributing and publishing plaintiffs works unlawfully, providing encouragement of and assistance to each other defendant to engage in the unauthorized infringement actions, and each defendants material contribution to each other defendants acts, as well as their control over the means and facilities by which such unauthorized reproductions and derivative works were created, as well as the substantial direct financial benefits that defendants derived from all the aforesaid acts, all done with full knowledge of their illegal consequences, and all defendant persons are thus contributorily and

vicariously liable for a vast number of intentional and direct copyright infringements.

126.    The infringement of each of plaintiff's rights in and to each of the copyrighted works constitutes separate and distinct acts of infringement.

127.    The foregoing acts of infringement by defendants have been willful, intentional and purposeful in disregard of and with indifference to plaintiffs and other author's rights.

128.    As a direct and proximate result of defendants infringement of plaintiffs copyrights and exclusive rights under copyrights and exclusive rights under copyright, plaintiff is entitled to damages as well as defendants profits pursuant to **17 USC 504(b)** for each infringement.

129.    Plaintiff is further entitled to attorney fees and full costs pursuant to **17 USC 505**.

130.    Defendants conduct threatens to cause, and is causing harm to plaintiff's business and property, and unless enjoined and restrained by this Court, will continue to cause plaintiff great and irreparable injury that cannot be fully compensated for or measured in money.  Plaintiff has no adequate remedy at law.  Pursuant to **17 USC 502**, plaintiff is entitled to preliminary and permanent injunctions prohibiting further infringements of its copyrights and exclusive rights under copyright.

## THIRD CLAIM FOR RELIEF:

**By plaintiff against all defendants for violation of 15 USC 1125**

**LANHAM ACT 43(a)**

43

131.    Plaintiff repeats and reavers each and every allegation contained in paragraphs 1 through 130, as if fully set forth herein, and further states and alleges that the title of a popular song generally functions as a trademark for that song and for the plaintiff who owns and controls all rights to the songs in question.

132.    This plaintiff has spent substantial sums of money to create, produce, promote and exploit each of its original works, and distributes these works independently for promotion and test marketing in various cities of the Northeastern and Southeastern United States.

133.    The titles and accompanying original expressions are the result of serious lyrical and musical technology at play.  Defendants are well aware of such technology, and used it in a manner un-like "reverse engineering", but done in that regard, except for infringement purposes, which is unlawful.  **(See: 142 Congressional Record, S12201, S12212 (daily ed. Oct. 1996).**

134.    Plaintiff, previous to defendant's unlawful intervention, had thusly developed and or had begun to develop invaluable goodwill in various cities of the U.S.A., as well as an excellent reputation throughout the aforementioned regions for plaintiff as well as his copyrighted works.

135.    Defendant persons have never been authorized by this plaintiff to make derivative works, distribute, mutilate, misappropriate, copy or otherwise exploit plaintiff's original songs.  Defendants have used paraphrased versions of derivative works to commercially express plaintiff's original protected expression.

44

136.    Defendants acts and conduct, as avered, has caused plaintiff and his property irreparable damages and are likely to continue to cause confusion or mistake and will deceive the general public as to the origin, sponsorship and or approval of defendants activities by the plaintiff.

137.    Defendant's conduct as averred herein constitutes Unfair Competition in violation of **15 USC 1125(a)** and **Lanham Act 43(a)**.

138.    Plaintiff is further informed and believes, and on this basis avers, that defendant persons intend to engage in the foregoing acts of Unfair Competition indefinitely, and that such conduct will continue to cause great and irreparable injury to the goodwill and business reputation of the plaintiff if not enjoined by this court.

139.    Pursuant to **15 USC 1116**, plaintiff is entitled to preliminary and permanent injunctive relief enjoining and restraining defendants from engaging in any further acts of **<u>Unfair Competition</u>**.

140.    Plaintiff is entitled to recover from defendants the damages, including attorney's fees it has sustained and any gains, profits and advantages obtained by the defendants as a result of their acts of **<u>Unfair Competition</u>** in any amount to be proved at the time of trial.

**<u>Wherefore</u>**, plaintiff prays for judgment against the affore-named defendant persons, and each of them as follows:

a. For defendant's profits and for damages in such amount as may be found or for such other amount as may be proper pursuant to **USC 504(c)**.

b. For damages according to proof for defendants violations of **15 USC 1125**.

c. For a preliminary and a permanent injunction enjoining defendants and defendants agents, servants, employees, officers, attorneys, successors, licensees, partners and assigns and all persons acting in concert of participation with each or any of them from:

    i. Directly or indirectly infringing in any manner any of plaintiffs respective copyrights or other exclusive rights (whether now in existence or hereafter created), including without limitation, copyrights or exclusive rights under copyright in the presently infringing derivative works belonging to the originator known as the plaintiff, and from using any expressions appropriated from the plaintiff ever again in any manner, including in any advertisement, promotion or marketing efforts in any medium of expression or in any manner likely to cause confusion or mistake or to deceive as to the affiliation of defendants with plaintiff, and or as to the origin, sponsorship, and/or approval of defendants activities by plaintiff.

d. For prejudgment interest according to law.

e. For plaintiffs attorney's fees, costs and disbursements in this action.

f. For such other and further relief as the court may deem just and proper.

46

# FOURTH CLAIM FOR RELIEF
## <u>CIVIL RICO</u>

141.    By Plaintiff against all implicated defendant persons, plaintiff repeats and reavers each and every allegation contained in paragraphs 1 through 140 and paragraph a through f, as if fully set forth herein, and further alleges and says the following:

142.    Both at the Federal and State levels, legislatures in the United States have attempted to protect important rights and promote important public policy goals by empowering private individuals to bring suit and recover attorney's fees and costs if they prevail. **(See: Newman v. Piggie Park Enterprises & S. Rep. No. 94-1011, p. 6 (1976**).

143.    Furthermore, **18 U.S.C. 1961**, in accord with **18 U.S.C. 1964(c),** permit litigation by private parties where extortion is alleged. Accordingly, plaintiff can, as a matter of fact and law, bring an action which includes allegations of Bank Fraud, Extortion, Criminal Copyright infringement, Trafficking in Counterfeit Labels, Interstate Transportation of Stolen Property as well as myriad other federal crimes as a private attorney general, since no other remedy is available at law. **(See Agency Holding Corp. v. Malley -Duff & Associates, 107 S.Ct., 2759, 483 U.S. 143, 151 (1987) & (Rotella v. Wood, et al 528 U.S. 549, (2000).**

144.    This is an action describing an unlawful Civil RICO Enterprise, which operates deeply within a legitimate network of businesses and individuals

consisting of <u>Universal Music Group</u>, <u>Warner Music Group</u> and <u>Viacom International</u>, as well as the afforementioned individual defendant/persons.

145.    **18 USC 1962(c)** makes it unlawful to conduct or participate directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity.

146.    The following defendant persons participated in the conduct of the unlawful enterprise directly or indirectly, some providing legitimate support, others providing illegitimate support, which equals criminality:

   a.  Universal Music Group (Criminality)

   b.  Warner Music Group (Criminality)

   c.  Viacom International ((Support)

   d.  Summer Redstone (Support)

   e.  Ted Turner (Support)

   f.  Zach Horowitz (Support)

   g.  Nick Taylor (Support)

   h.  Kanye West (Criminality)

   i.  John Legend (Criminality)

   j.  Ms. Brandy Norwood (Criminality)

   k.  Lil Wayne (Criminality)

   l.  Young buck (Criminality)

   m. Lloyd Banks (Criminality)

   n.  Eminem (Criminality)

   o.  Roy Jones, Jr. (Criminality)

   p.  Yin Yang Twins (Criminality)

   q.  Ludacris (Criminality)

r.  Ahmet Ertegon (Support)

s.  Juvenile (Criminality)

t.  Fat Joe (Criminality)

u.  Inside Sessions (Criminality)

v.  Def Jam Music (Support)

w.  Interscope Records (Support)

x.  Cash Money Records (Support)

147.    The aforementioned defendant persons are representative of the known quality and quantity of the unlawful enterprise, yet, these remain distinct from the enterprise, which exists and operates unlawfully within the legitimate businesses and the wills of the individuals that employ them.

148.    The aforementioned association in fact enterprise conducts the business of unlawfully making derivative works of original copyrighted works that do not belong to them, for the sake of the enterprise, and through a pattern of racketeering predicates of mail fraud and other federal crimes, accomplishes unlawful copyright infringement whenever the need arises. **(See: Sedima, S.PR.L. v. Imrex Co., 473 U.S. 479, 496 (1985).**

149.     Persons herein alleged to be implicated in the RICO violations are totally distinct from the RICO enterprise and are not the same "person" merely referred to under a different name.  **(See Cedric Kushner Promotions, Ltd. V. King, 533 U.S. 158, 161 (2004)**.

150.    Thus, defendants are alleged to be "a group of persons associated together for a common purpose of engaging in a course of conduct which deprived the plaintiff of valuable song rights. **(See: United States v. Coonan, 938 F. 2d 1553, 1560-62 (2d cir 1991)**.

49

151.    It is not being alleged that any corporation "conspired with itself" to accomplish the complained of conduct, or to have infiltrated itself. Instead, plaintiff alleges the corporations have been infiltrated by the "association of fact " individuals themselves, thereby converting the legitimate business of defendants into a sometimes-illegitimate operation. **(See: Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Local Union 639, 883 F.2d 132, 139-40 (D.C. Cir. 1990)**.

152.    Atlantic, Universal and Viacom are merely the defendant "persons" infiltrated by the <u>association in fact</u> enterprise.

153.    Therefore, everyone was not "<u>in on it</u>", in that each function of the enterprise remained a mystery and a secret from other members who all hold a separate and distinct purpose within the organization, e.g.:

> **"Specifically, Inside Sessions acquires the property, Universal and Atlantic distribute and make derivatives of the songs acquired by Inside Sessions, and Viacom in turn syndicates all publicity rights and television broadcasts of all artists and songs involved with the infringement and or songs, which were not infringed".**

154.    YoWorld or the plaintiff's songs were never available to the entire industry. The company held (1) one concert where a few hundred people showed up, and all street team events were geared for select audiences to determine response and receptiveness to certain songs and acts.

155.    The manner in which the enterprise runs or operates its illegitimate business is based upon "Inside Sessions" extortionate methods of obtaining the materials first. After this, the songs enter a huge network of decision makers in need of original materials. These decision makers all have a cadre of artists and acts they represent and or own.

156.     All alleged predicate acts of mail fraud were accomplished by
Atlantic Records and Universal Music via their agents **Geoff Siegel**, **Brian
Wittmer**, **Adam Fischell** & **Rich Christina**.  There are approximately (8)
eight acts of predicate Mail fraud, which further tend to show the enterprise
is nothing more than a "<u>continuing unit</u>" of criminality designed to extort
and steal original songs from their rightful owners, on an open academy
type basis.

157.     All correspondences between YoWorld and Universal were not
innocent nor was Universal doing a legitimate business, but instead, they
were merely obtaining original songs by trick, since the normal procedure
for obtaining such materials is by attorney or other well recognized agent.

158.     The mail and email transactions, which transpired between plaintiff
and Universal, were transmissions designed to extort and steal original
works.  Universal had no intention whatsoever of ever signing any act of
YoWorld or any song of YoWorld, legitimately, but instead merely worked
to build plaintiffs confidence merely to lift plaintiffs works unlawfully.

159.     Liability is therefore directed to extend to upper management as well
as lower level management and so-called "artist" employees and their
handlers, which act solely under the directions of upper management, as
well as those persons otherwise associated with this enterprise who exert
control over it, and participate in the operation and management of the
enterprise overall purposes.

160.     The enterprise itself, consisting of legitimate businesses and
individuals, is a separate and passive instrumental tool of the defendant
persons; therefore, the enterprise surreptiously operates as two different

entities, i.e. the enterprise itself, as a mere tool or conduit for the activities of the named defendant persons, and the defendant persons themselves, which represent two distinct entities in operation.

## ASSOCIATION IN FACT ENTERPRISE

161.    The defendant persons of this action are therefore representative of an "**Association In Fact**" enterprise, consisting of a union or group of individuals associated in fact, though not a legal entity, but secretly and openly inter-connected for purposes of unlawful acts.

## CONTINUITY

162.    The alleged <u>association in fact</u> enterprise is not merely a corporate entity and its agents conducting their regular business.  The complained of conduct which allows the defendants to eventually <u>obtain valuable property by extortion</u> represents repeated conduct which by its nature projects into the future with a threat of repetition due to the objectives of "<u>Inside Sessions</u>" music critique program instituted by Universal Music Group. **(See: Exhibit(s) B, C & D)**.

163.    Even though the very "**nucleus of the enterprise**, "**Inside Sessions**" appears to be now mysteriously and temporarily closed as far as the internet is concerned, this operation has already **purloined nearly 100 songs** from this plaintiff alone, over a two-year period.

164.    Therefore, defendants can obviously begin infringing the rest of those songs at any time in the future, as well as do the same thing with the

thousands of other songs obtained via this operation from other authors, whenever the need arises, and at any time in the future, since Inside Sessions is still an integral part of UMG's arsenal of companies. **(See Exhibit G).**

165.    Thus, there is indeed a grave threat of continued repetition of these actions, since this action only represents a mere (10) ten songs. The songs at issue here are merely some of the songs this plaintiff discovered using as diligent a search as possible. However, only a proper and diligent discovery process will determine how many more of plaintiff's works were treated in this manner, since this treatise is hardly representative of what the defendants still possess, and possibly plan to infringe in the future.

166.    This glaring and continuing threat is dangerous because the union of defendants with the "enterprise" is so strong it can merely switch artists at any time, at any place and with any artist in the world, into infinity, casting new faces on completely stolen songs whenever the need arises. Continuity is self-evident.

## PATTERN OF RACKETEERING ACTIVITY

165. Although the end result of the racketeering activity herein complained of is the actual and ultimate ownership of re-created derivative works of the plaintiff, and other authors purloined via "**Inside Sessions**" and by way of

extortion, the following will outline the pattern of racketeering activity and the multiple schemes attached to these actions.

a. First, "**Inside Sessions**" actively solicits artists by offering them supposed access to top record executives, claiming the purchase of the initial program is taught by Elton John, Sting, Russell Simmons, etc. **(Exhibit D).** This initial scheme merely gathers up artists, worldwide, while charging a fee of $200.00.

b. After purchasing the program, the first scheme is complete. A sale has been made of the <u>idea</u> that "**Inside Sessions**" is an oasis of trust in the shark-filled waters of the recording industry.

c. The next scheme comes into play when Universal A&R executives from "<u>Inside Sessions</u>" offer to critique the original songs of authors who paid the $200.00 fee.

d. This scheme is meant to gather up songs and in return the author is given a written critique, by U.S. mails, concerning select songs (usually 3) that the A&R person wishes to discuss. **(See: Exhibit E & F)**.

e. After this scheme is complete, the artist hurries to get more and more "<u>critiques</u>" so he sends in more and more songs. (See Exhibit G & H where excited plaintiff's email informs "**Inside Sessions**" about a 38 song project to be used on their upcoming tour. Those songs were submitted as well, even though Universal suddenly claimed no A&R people worked at <u>Inside Sessions</u> any longer: **(See: Exhibit G)**.

f. The next scheme involves changing the original works into derivative works and finding a cast member/artist to perform the work.

g. Next, the product must be legitimized and the falsely created product promoted and advertised and all rights in the bogus product obtained, legitimately.

h. The major scheme driving all the activities of the enterprise is based on the desire to eliminate the force of the competitions hot-sounding products. The only way to do this is to <u>paraphrase</u> and create <u>derivative works</u> out of works already being enjoyed and sold by small independent record labels. This practice dilutes the quality of the song created by the small independent record label, or independent author wishing to create and sell his or her own product in the same marketplace.

i. Also, the enterprise had to <u>devise another potent scheme</u> to keep the legitimate parts of the business blind to how songs are actually acquired, thereby using the legitimate business' prestige and power to further the unlawful enterprise.

j. Therefore, the facts show a multiplicity of schemes, all relating to song theft and or obtaining songs from countless artists and authors, unlawfully. The multiple schemes can be summed up thusly:

    i. **<u>Scheme to eliminate or dilute song competition</u>**

    ii. **<u>Scheme to keep legitimate business part of enterprise blind to how songs are obtained</u>**

    iii. **<u>Scheme to later "legitimize" false products and promote and advertise the same, as if no theft has occurred.</u>**

    iv. **<u>Scheme to change every original work obtained into a mere derivative of the original.</u>**

    v.  **Scheme to obtain confidence of authors via the enterprises "Inside Sessions" program.**

   vi.  **Scheme to obtain original songs from authors under the guise of "musical critique".**

 vii.  **Scheme to extort by using "fear" of economic harm and powerful official positions to intimidate authors into freely giving property.**

viii.  **Scheme to maintain monopoly in recording industry by not having to pay authors for original songs.**

  ix.  **Scheme to place stolen property into interstate commerce, knowing the same to be stolen.**

   x.  **Scheme to make banks and high caliber institutions trust defendants ability to constantly provide the public with hit quality songs.**

167.    The aforementioned multiple schemes which are being constantly employed by these defendant persons has very little to do with this plaintiff, and everything to do with the <u>threat of continuing unlawful activity</u> and <u>Continuity</u> for RICO purposes.

## EXTERNAL PREDICATE ORGANIZING PRINCIPLES

168.    The most prevalent and glaring" **<u>external organizing principle</u>**" which orders and arranges the predicates alleged in this case is based on the fact that all mail fraud and other criminal predicate acts are related to the <u>surrepticious</u> taking of property, worldwide, by means of the "**<u>Inside</u>**

**Sessions**" extortion operation. This multiple pattern of predicate activities being committed by the defendants is not simply a multiplicity of loosely defined and speculative predicates, but instead, a crystal clear illustration of how a recording industry giant maintains number one status by creating conduits that gather songs and decides which to use best and when.

169.    The "**External Organizing Principles**" being daily applied by the enterprise, are the stuff that mandates and guarantees success of any record company powerful enough to put such mechanisms in place, and such powerful exploits indeed describe a pattern which more than threatens future repetition, since there is no telling how many thousands of songs defendants have already stolen in this manner, or when in the future they will use them, nor how many other authors and record companies and publishers were duped and hoodwinked in this same criminal manner.

170.    Therefore, the allegedly fraudulent acts of mail fraud and extortion committed against "this plaintiff" were not acts committed in furtherance of a "**single scheme**", and merely directed at "this plaintiff", since the defendants apply the same practices to whomever, and "this plaintiff" is only a small part of the larger picture of multiple schemes outlined before, all with the same objectives, which are to obtain songs, no matter if they belong to this plaintiff or to any one else, plain and simple.

171.    In that context, and pursuant to **18 USC 1961((5)** the two statutory predicate acts of mail fraud occurred on February 11, 2002, and December 2, 2002 **(See: Exhibit B & C).** Other events implicating the defendants in incidents of mail fraud are the (8) eight emails from the "**Inside Sessions**" program. **(See Exhibit O).**

172.     Other instances of mail fraud violative of **18 USC 1341 & 1343** are
Atlantic Records inviting plaintiff to continue sending original songs to
Atlantic Records.  **(See Exhibit J, K & L)**

173.     The above racketeering predicates are related to the enterprises
activities directly, and represents the required <u>continuity</u> that shows such
acts are related, and as such, they either constitute or threaten long-term
criminal activity.

174.     The aforementioned activities of defendants are a regular way of
doing business for ongoing entities like the alleged association in fact,
which remains deeply cloaked behind the legitimate businesses of <u>Universal
Music Group</u>, <u>Atlantic Music Group</u> and <u>Viacom International</u>.

175.     Furthermore, it is alleged that the named defendant persons conspired
under **18 USC 1964(d)** to violate the provisions of **18 USC 1962 (c)**
because the <u>alleged pattern of predicate acts</u> was not mere "<u>sporadic
activity</u>", but instead the inner workings of a small network or cadre of
individuals and corporations, surreptiously and openly supported by high
powered entities and individuals for the sake of commercial gain and private
financial enrichment.

176.     Thus, the criminal conduct alleged herein has the same purposes,
results, participants, victims and methods of commission and are
interrelated by the distinguishing characteristics outlined in the multiple
scheme description, and are not merely isolated events that happened only
to this plaintiff.

177.     Thus, the defendants were engaged in these activities within the past
(10) ten years and the defendants engage in criminal activities other than the

taking of plaintiff's songs, but also other myriad number of authors songs which also paid a fee to "**Inside Sessions**" within the past (10) ten years.

178.    The mere two (2) statutory predicate acts of mail fraud were the result of over a year of cultivation and manipulation of plaintiff, and others, by the defendants (Inside Sessions) by way of email and regular mail, merely to build the confidence of authors and publishers and record companies. **(See: Exhibit H, pg. 8).**

179.    Plaintiff became **order number 30501** on 11.28.01. Exhibit I shows plaintiff's company still being "duped" by the defendants on December 9, 2002, or 13 months and 8 emails later. **(See Exhibit O)**

180.    Whatever the case may be, a **RICO** pattern is firmly established here since the related predicates involve and pose a distinct threat of long-term racketeering activity, explicitly and implicitly.

181.    The employment of "**Inside Sessions**" by Universal Music Group is part of the enterprise's "**regular way of doing business",** and not an aberration or isolated event, but merely a long term association of defendant persons that exists for criminal purposes. **(See Exhibit G).**

182.    This plaintiff however, represents an entire class of victims and victims unrecognized and unknown, and not just himself alone. Meaning, every author whomever encountered the "**Inside Sessions**" enterprise occupies such a class of victims and had their property purloined, if they paid "**Inside Sessions**" the $200.00 fee to "critique" their material, whether the original authors ever eventually found out or not, the "enterprise" may have paraphrased and created a derivative work from the authors works as

well, or intend to in the future. Discovery will reveal many and other potential victims.

183.    This plaintiff is merely one voice representing several songs the defendant persons decided to make popular without the original plaintiff/ authors consent. Only the powers of discovery can determine whom else this has happened to and to what extent this has happened to the plaintiff of its literal expressions.

## ENTERPRISE

184.    The aforementioned enterprise may be more fully described here. The defendant persons represent a relatively "**loose knit**" group of people and legal entities that are employees and subsidiaries of the (3) three main defendant persons and those named main defendant persons, or the parent corporations of those persons involved with the enterprise. Thus, we have here an "**association-in-fact enterprise**", consisting of the defendant persons named in the caption.

185.    The defendant person's named in the caption possess **continuity of structure** in that each persons activities compliment the others, and the personnel are employees with common and shared purposes. The structure of such an enterprise is distinct from that inherent in the pattern of racketeering they happen to casually belong to.

186.    The continuity of the structure and personnel of this enterprise <u>are not</u> a membership of individuals and companies, which is constantly in a state of flux. There is no fleeting consistency with regard to the number of group

members or their identities, since there will always be an "umbrella of (3)
conglomerates" which actually provides a homebase for all other defendant
persons involved in the unlawful enterprise whenever the need arises.

187.     Thus, the group of defendant persons only "<u>shared purpose</u>" is not to
carry out criminal activities alone. Instead they choose to operate deeply
within the confines of a legitimate business and allow <u>legitimate business</u> to
operate alongside <u>illigitamate business</u>. Therefore, the totally legitimate
activities of this enterprise must not be confused with the pattern of
racketeering activity, since this "<u>group</u>" engages in a diverse pattern of
crimes via the activities of its "**Inside Sessions**" program and within the
confines of legitimate business.

188.     Thus, the enterprise encompasses much more than what is necessary
to perpetrate the mere predicate crimes of mail fraud, since this enterprise is
also used to commit <u>extortion, unfair competition, copyright infringement,</u>
<u>criminal copyright infringement, trade secret theft and misappropriation,</u>
<u>false advertising, interstate transport of stolen property, bank fraud and</u>
<u>violations of the economic espionage act;</u> and all this aside from the
common link of legitimacy that exists throughout this group which also
operates as an unlawful enterprise "**whenever the need arises**".

## PERSON / ENTERPRISE DISTINCTION

189.     The defendant persons did not act on behalf of the corporation, <u>but on</u>
<u>behalf of themselves</u> and their desire to <u>make unlawful profits mingle with</u>

the lawful profits of the legitimate parts of the defendants collective businesses.

190.    Thus, the corporations herein described are alleged to be engaging in a pattern of racketeering activity through legal entities beyond its control. E.g.: Viacom can't control Warner, Warner can't control Universal, Universal cant control Viacom and so on, even though they all exist and operate and complement each other together, yet function distinctly, as internal and integral parts of an unlawful **RICO** enterprise. **(See: Fitzgerald v Chrysler Corp. 116 F.3d, 225, 228 (7th Cir. 1997)**.

191.    Again, all individual defendant persons are "separate and distinct" from the enterprise. The herein named defendant persons & corporate entities and persons merely "associate" with the enterprise. **(See: River City Markets Inc., 960 F.2d at 1461.)** Yet, the defendant persons remain distinctly an "association in fact enterprise".

192.    The many acts of mail fraud and other predicate crimes possess an automatic and inherent nexus with interstate commerce, so such a nexus has been established in this case. **United States v Elliot, 89 F.3d 1360 (8th Cir. 1996) & United States v. Beasley, 72 F.3d 1518 (11th Cir) cert. Den, 518 U.S. 1027 (1996)**.

193.    All the named defendant persons therefore conducted, and or participated directly and indirectly in the conduct of the enterprises affairs. Therefore, the complained of enterprise is not simply run by the upper management of individual defendants firms, but by lower level employees and directors from other firms as well, who exert control over the enterprise

whenever the need arises, and performs or supports the "extortion scenario" of "**Inside Sessions**" at the time needed.

## THIS ACTION NOT SOLELY BASED ON MAIL FRAUD PREDICATES

194.    This action is not solely based on mail fraud statutes, but also upon Direct Copyright Infringement and Criminal Copyright Infringement, Bank Fraud, Hobbs Act, Lanham Act, Economic Espionage Act, Theft and Misappropriation of Trade Secrets and Interstate Transportation of Stolen Property.

195.    Therefore, plaintiff is alleging that the defendant persons, via their unlawful enterprise, are precisely the "cause in fact" for the damages caused to his business and property.  Such "cause in fact" represents the legal and proximate cause as well, since, if defendants did this much damage to this plaintiff, it should be held fully responsible due to this same extortion scenario possibly happening to countless others. There is no way plaintiff could have foreseen such injuries, since plaintiff relied on all statements made by defendants and the enterprise via the U.S. mails and e-mails. **(See: Exhibit O).**

196.    That plaintiff "reasonably relied" upon statements made by defendant enterprise concerning "music critiques" and "insider views" about getting into the record business is seen in the back and forth relationship between plaintiff and defendants emails and letters. **(See Exhibit B, C & O)**.

63

197.    Plaintiff relied upon this guise or smoke screen when defendants knew all the while which songs would be stolen and recreated into a derivative work of the original.

198.    Thus, using the mails, the enterprise's "**Inside Sessions**" program/concept attempts to disrupt the competitions market position as well as the quality of products being sold by the competition.

199.    Knowing the communication between plaintiff and the enterprises "**Inside Sessions**" to be false, the defendants proceeded to "divvy up" the spoils by re-casting the new "**derivative works**" of the plaintiff in various big name artists, in order for the songs to immediately reach top 10 status and supplant songs already released by plaintiff's independent label.

200.    Thus, judging from the last email sent to the defendants by plaintiffs company, informing "**Inside Sessions**" A&R director Geoff Seigel that we were sending (2) more albums which we would also be selling across the country, plaintiff became a new target for the enterprise to act upon and a new competitor to ruthlessly attack.  **(See Exhibit O, pg. 8) & (See: Proctor & Gamble co. v. Amway Corp. 242 F.3d 539 (5th cir. 2001).** Personal injury is not being alleged in this case, only damages to plaintiffs business and property.

201.    This association in fact enterprise acts based on the premises that parts of it perpetrate crimes and other parts merely provide support, all to achieve the same criminal objectives.

202.    For example, Universal Music Group provides support for Inside Sessions to perpetrate crimes of extortion and copyright infringement, Warner Music Group provides support for Kanye West to perpetrate

copyright crimes, <u>Viacom International</u> provides support, and <u>MTV & BET</u> perpetrate copyright crimes.  All work to achieve the same criminal objectives however, which are to totally legitimize all products with questionable origins.

203.    Since plaintiff is in the business of creating original songs and albums as well as developing artists, the injuries to plaintiff hurt his actual business as well as the value of his company and songs.  Thus, the enterprise alleged herein is both legitimate and illegitimate.

204.    The enterprise herein alleged is also different and distinct from the alleged defendant persons; thus, there is a **person/enterprise distinction**.

205.    The defendant persons merely associate with the group or enterprise while remaining distinct, whenever the need arises.

206.    Not one corporation is alleged to be in association with its own employees, agents or affiliates, but instead, with an unlawful enterprise made up of an association of individuals in fact, and corporations and individuals, but not necessarily legally linked entities.

207.    Thus, the defendant persons are linked by much more than their mere participation or involvement directly or indirectly with the unlawful enterprise.  On the surface, all defendant persons are legitimate businesses and businessmen, interacting with the enterprise and their respective employers, as any employee would.  The racketeering activity is thus separate and distinct from the actual enterprise.

208.    The herein complained of **RICO** enterprise is not solely motivated by economic gain, but also by the desire to make competitive gains against other companies vying for same type of customer, as well as a motivation to

prevent great authors songs from entering the mainstream marketplace unless they are fully owned by the enterprise.

209.    It is further alleged that all defendant persons participated in the affairs of the enterprise directly or indirectly, passively and actively.

210.    Therefore, plaintiff has been injured in his business and property by reason of the conduct constituting the herein complained of violations pursuant to **18 USC 1962(c) & 18 USC 1964(d).**

## LIABILITY AS IT RELATES TO EACH DEFENDANT PERSON

211.    **Universal Music Group Board of Directors & CEO's**: Copyright Infringement, Contributory Copyright Infringement, Criminal Copyright Infringement, RICO, Mail & Wire Fraud, Extortion, Unfair Completion, Theft of Trade Secrets, Interstate Transport of Stolen Property, The Travel Act, Lanham Act, Bank Fraud, & Money Laundering.

212.    **Warner Music Group**: Copyright Infringement, Contributory Copyright Infringement, Criminal Copyright Infringement, RICO, Mail & Wire Fraud, Extortion, Unfair Completion, Theft of Trade Secrets, Interstate Transport of Stolen Property, The Travel Act, Lanham Act, Bank Fraud, & Money Laundering.

213.    **Viacom International**: Copyright Infringement, Contributory Infringement, and RICO.

214.    **Warner Music Group** affected subsidiaries, Warner Chappell Publishing & Atlantic Records.  Copyright Infringement, Contributory Copyright Infringement, Criminal Copyright Infringement, RICO, Mail &

Wire Fraud, Extortion, Unfair Completion, Theft of Trade Secrets, Interstate Transport of Stolen Property, The Travel Act, Lanham Act, Bank Fraud, & Money Laundering.

215.    **Universal Music Group** affected subsidiaries, Def Jam, Interscope, Cash Money Records.  Copyright Infringement, Contributory Copyright Infringement, Criminal Copyright Infringement, RICO, Mail & Wire Fraud, Extortion, Unfair Completion, Theft of Trade Secrets, Interstate Transport of Stolen Property, The Travel Act, Lanham Act, Bank Fraud, & Money Laundering.

216.    **Viacom International** affected subsidiaries, MTV, BET and VH1, Copyright Infringement, Contributory Copyright Infringement, RICO.

217.    Universal officers and directors Zach Horowitz, Nick Henry, Damon Dash, "Baby" and Shawn Carter: Copyright Infringement, Contributory Copyright Infringement, Criminal Copyright Infringement, RICO, Mail & Wire Fraud, Extortion, Unfair Completion, Theft of Trade Secrets, Interstate Transport of Stolen Property, The Travel Act, Lanham Act, Bank Fraud, & Money Laundering.

218.    **Warner Music Group** officers and directors Almet Ertegun and Board of Directors of Atlantic Records & Warner Chappell Music Publishing Company.  Copyright Infringement, Contributory Copyright Infringement, Criminal Copyright Infringement, RICO, Mail & Wire Fraud, Extortion, Unfair Completion, Theft of Trade Secrets, Interstate Transport of Stolen Property, The Travel Act, Lanham Act, Bank Fraud, & Money Laundering.

219.    **Viacom International** Officers & Directors, Sumner Redstone and Board of Directors & MTV, BET & VH1.  Copyright Infringement, Contributory Copyright Infringement, RICO.

220.    All named individual "artist", defendant/person designees; namely, Kanye West, Brandy, Young Buck, Lil Wayne, Yin Yang Twins, Eminem, Roy Jones, Jr., John Legend, T. I., & Fat Joe.  Copyright Infringement, Contributory Copyright Infringement and RICO.

221.    Liability further should extend contributorily as well as vicariously since each employer benefits from its employees **18 USC1962(c)** violations, and since the alleged employers are alleged to be distinct from the enterprise itself.

222.    The "**Association in Fact**" group of individuals herein complained of also contains corporations and their subsidiaries, and these are deemed all "**defendant persons**" implicated by this complaint.

223.    The normal day to day business affairs of Universal Music Group, Warner Music Group & Viacom International are totally legitimate and for all intents and purposes "squeaky clean" on the surface, aside from the abhorrent behavior of the employees of said corporations which falls outside the corporations legitimate businesses.

224.    However, the complained of predicate acts bear direct relationships to each other since each one relates directly to necessary steps taken by the alleged wrong doers to attempt to legitamize a counterfeit song operation. i.e. extortion occurs as **Inside Sessions** solicits and extorts clients to obtain property with their consent.  The extortion is merely done in order to perform copyright infringement and other predicate crimes.

225.     The Lanham Act gets violated from the initial theft of the song and
its subsequent false advertising.  Money laundering and bank fraud come
into play since defendants know of the stolen nature of some of its products.
Direct relationships like these of course show the hand of some "external
organizing" principles that apply merely to aid the enterprise in song theft.

### 18 U. S. C. 1964(d) RICO Conspiracy Alleged in Detail:

226.     In this **RICO** conspiracy scenario, all parties involved knew of the
activities being employed by **Universal Music Group** to obtain songs via
its "**Inside Sessions**" program, and all agreed to allow this program to be
the nucleus of the "**song farming**" operation of the enterprise, which
unlawfully enriched all the other defendants who merely agreed to pursue
the same criminal objectives.

227.      **Universal Music Groups** plan calls for some entities and
individuals to perpetuate crime and others to provide support, or both.  In
this light, it is clear that **Inside Sessions**, perpetuates crimes and provides
support for criminal activities, UMG provides support as well as perpetrates
crimes for sake of criminal enterprise, Warner Music Group provides
support, Kanye West perpetuates crime, Viacom International provides
support, BET, MTV & VH1 perpetuate crimes.

228.     Prior to becoming involved with UMG's "**Inside Sessions**" program,
plaintiff's company was in the business of creating original songs,
developing acts and the total manufacturing and distribution of the song
products the company made via street teams which sold the CD's for

between 5 and 10 dollars. When the chorus lines of the plaintiff started being repeatedly heard by our associates and customers, and the paraphrasing by the enterprise became evident, confusion arose concerning who the real authors of certain title songs really are, as well as their origin.

229.    Plaintiff could hardly continue to boast of unique and original expressions in the Hip Hop music markets, since big name artists were also suddenly performing basically the same songs. This caused plaintiff's sales and team morale to drop, as it became harder and harder to make sales or retain street team members.

230.    Plaintiff's business of distributing music in the streets was devastated, since every new record put out would only trigger the major label to make derivatives from the company's originals, and promote the song really big, while using big name artists. Thus, the street team operation had to be suspended for the sake of this litigation as well as because defendants are literally stalking plaintiff to be the first to hear new releases. As for the injury to plaintiff's property, this action itself outlines those injuries in detail in claims 1 and 2 and elsewhere as certain causes of action are alleged and applied.

231.    List of Damages Sustained by Reason of **18 USC 1962(c)** violations:

    a. Loss of right to create derivative works out of works owned by plaintiff.

    b. Loss of the value of original songs, which were designed for specific markets targeted also by the defendants.

c. Loss of profit as sales fell and virtually disappeared on albums where the defendants chose to unlawfully paraphrase the chorus lines of plaintiff's original songs.

d. Loss of goodwill as plaintiff's company is suddenly trivialized by the big competitors decisions to create derivative works from plaintiff's originals.

e. Plaintiff's (5) five exclusive rights to copyright were also violated by reason of the **18 USC1962(c)** violation.

f. Loss of anticipated revenue from (3) three albums in terms of street team sales, since defendants decided to unlawfully create derivative works from plaintiff's originals.

g. Costs and effects of this litigation caused the plaintiff, to sacrifice the street team marketing efforts in order to seek redress for such flagrant violations of **18 USC 1962(c)** and applicable Copyright Laws.

## FIFTH CLAIM FOR RELIEF
## BANK FRAUD 18 USC 1344(2)

232.    Plaintiff repeats and reavers paragraphs 1 through 231, and paragraphs a thru g, as if fully set forth herein, and further alleges:

**"Whoever knowingly executes, or attempts to execute, a scheme or artifice: to defraud a financial institution, or to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a financial institution, by means of false or fraudulent pretenses, representations or promise, shall be fined not more than $1,000,000 or imprisoned for not more than 30 years or both".**

233.    This additional predicate act, which further relates to the continuity of
the enterprise, shows how the defendant enterprise initially gets authors
works, by "charging a fee" to "allow you the right" to send the "Inside
Sessions" program original songs. **(See Exhibit O).**

234.    This fee is paid by mail, literally from bank to bank. This plaintiffs
funds were initially "under the control of a bank" for this transaction, and
the fee was all part of defendants ploy to eventually obtain songs they could
infringe, knowing the transaction would be involving banks, and the deepest
part of the scheme which causes authors to pay this fee, from their bank,
merely so the "**Inside Sessions enterprise**" can unlawfully exploit the
original works it obtains whenever the need arises".

235.    The charging of a **$200** fee and the manipulative and false letters and
emails all attest to the fact that the defendant persons readily encounter
banks while in the midst of schemes to defraud and deceive authors merely
to unlawfully obtain their copyright protected works. **(See Exhibit O).**

236.    In doing the acts averred herein above, defendants and each of them,
have engaged in a conspiracy to commit bank fraud, operated and provided
support for the common enterprise and common course of conduct, the
purpose of which, has been among other things, to serve each of these
defendants own economic benefit, by knowingly, willfully and intentionally
infringing plaintiff's copyrighted songs, performing whatever predicate
crime necessary to make the bogus works appear to be legitimate.

237.    Therefore, each defendant actively participates in, facilitates,
materially contributes to and encourages the unlawful activities of each

other defendant as averred herein above, and each defendant profits from these activities.  Plaintiff is being irreparably harmed by the conduct of the defendant persons, and each of them, and has further suffered significant damages, for which each defendant is liable.  **(See Relief Sought in Relief Section)**.

## SIXTH CLAIM FOR RELIEF
## <u>EXTORTION</u>

238.    Plaintiff repeats and reavers the averments of paragraphs 1 through 237 as if fully set forth herein, and further alleges that via the support of the legitimate business of defendant persons, an elaborate extortion operation exists within the legitimate business operations of the named defendants.

239.    It appears that now, perhaps due to this lawsuit, the "nucleus" of the extortion operation/enterprise is "<u>temporarily out of order</u>".  Inside Sessions program, which is a subsidiary of Universal Music Group dupes authors and record label competitors into turning over highly original songs, for a fee, under the guise of "musical critique" merely to re-create derivative works from these works, after casting a number one act they own to perform the quasi-legitimate Frankenstein-like creation.  **(See: Inside Sessions 8 emails and 2 critiques using U.S. mails, Exhibits B, C & O)**

240.    Due to the multibillion dollar might and defendants number one market status, the author or artist who is allowed to pay the fee to send in songs, does so in a natural statue of "<u>anxious concern</u>" and alarm due to the defendants ability to "<u>make or break</u>" an author or his/her songs.  This fear instilled in so-called "clients" of the defendants, includes fear of "economic

loss or injury". Such fear was indeed reasonable under the circumstances, as this action loudly attests to.

241.    Aside from the demos sent to "Inside Sessions" plaintiff's company also felt compelled to consent to sending "Inside Sessions" the (2) two albums the company took on tour "**Armageddon**" and "**Shoot to Kill**". **(See: Exhibit E).** This was done out of fear the defendants would view our album distribution campaign marketing operation negatively and cause them to fail to sign the company's highly commercial acts in the future.

242.    This "well-placed fear" coupled with the good will and intent from plaintiff's firm was finally learned to be merely a part of the overall extortion plot and that defendants were taking songs on an open-academy type basis already.

243.    Thus, as the number one leader of the entire entertainment industry, UMG takes original songs via its "Inside Sessions" program, "under color of official right", and such power and seemingly official business operation fully induces innocent authors to part with property which will be used for unlawful purposes.

244.    Such activities constitute extortion and do violate **18 USC 1951**, since plaintiff's song property is considered as a source of wealth. **(See: United States v. Provenzano, 334 F.2d 678 (3rd Cir.) cert. Denied, 379 U.S. 947 (1964)**.

245.    UMG holds the key to virtually "every music industry opportunity" on the face of the Earth . All independent record labels seeking a label deal must recognize that UMG can say yes, or say no, and both these options can make or break an independent label, especially if UMG decides to steal

song expressions and thereby limit the plaintiffs ability to complete in the same marketplace. Obviously even trying to be friendly with UMG in this manner can still result in UMG affecting ones ability to compete, if UMG thinks ones products need to be subdued competitively.

246.    The "third party" position of "**Inside Sessions**" is merely the conduit which delivers the unlawfully obtained works into the hands of those designated to re-create and re-legitimize the work into a mere derivative of the original work.

247.    **18 USC 1951** defines extortion in terms of "the obtaining of property from another, with his consent… under color of official right". This statute describes the activities of "**Inside Sessions**" precisely.

248.    The extortion herein alleged was done with the intent to cause unlawfully obtained music products to enter into commerce in further violation of **18 USC 1951** and in furtherance of the overall RICO scheme to obtain and wrongfully own others property.

249.    **(See: Relief section for relief sought)**

## SEVENTH CLAIM FOR RELIEF
### Criminal Copyright Infringement Under 17 USC 506(a) & 18 USC 2319

250.    Plaintiff repeats and reavers the averments of paragraphs 1 through 249, and further alleges and says, the aforementioned activities are also violative of **17 USC 506(a)** and **18 USC 2319** since motion pictures are involved as well as commercially exploited song material, and since

75

defendants activities occur after the 1992 amendments, all types of works are now protected.

251.    Felony levels of penalty should apply since the defendants unlawfully reproduced far more than the statutory 2500.00 in retail value.  This factor makes defendants liable to the plaintiff since (1) a valid copyright exists in the works defendants unlawfully made derivative versions of, (2) such activity equals infringement by the defendants of property proprietary to the plaintiff, (3) such conduct as alleged, was willful and purposeful, and (4) all done for purposes of commercial advantage or private financial gain.  **(See: United States v. Mazer, 69 F.3d 222, 227 (8th Cir. 1995)**.

252.    Only the plaintiff has the right to enjoy the (5) five exclusive rights protecting works he created.  Namely: **17 USC 106 1-5**, the right to prepare derivative works or perform the work publicly, as well as the right to reproduce and distribute copies of the work.  Any unauthorized exercise of these rights will constitute an act of infringement and will give rise at least to a civil infringement claim by the copyright holder.

253.    It is unnecessary that plaintiff demonstrate that an allegedly infringing article is identical to the original work in all respects**. (See: United States v. O'Reilley, 794 F.2d 613, 615 (11th Cir. 1986)**.  Instead, simply demonstrating a "substantial similarity" between the original work and the suspect copy may show infringement.  **(See: Hoehling v. Universal City Studios, Inc. 618, and F2d 972, 977 (2d. Cir.) Cert. Denied 449 U.S. 841, (1980)**.

254.    A copy has been held to be substantially similar to an original work where the copy is so similar to the original that an ordinary reasonable

person would conclude that the defendant unlawfully appropriated the copyright owners protectible expression by taking material of "substance and value". **(See: Atari Inc. v. North American Phillips Consumer Elec. Corp. 672 F.2d 607, 614 (7th Cir.) cert. Den. 459 U.S. 880 (1982)**. That same <u>substance and value</u> are literally the chorus line expressions emanating from plaintiff's original songs.

255.    The above described unlawful derivative re-creations of plaintiffs originals were therefore done solely for purposes of commercial advantage and private financial gain, and to enhance careers of artists needing hot songs immediately.

## INTENT

256.    As a factual matter, defendants intended to infringe plaintiff's copyrights by making derivative versions of the works.  The extortionate methods of obtaining the works outlined earlier are further proof of defendant's intent to infringe, with the "hopes" of making a profit. **(See: United States v. Cross, 816 F.2d 297, 301. (7th Cir. 1987); United States v. Shabazz, 724, F.2d 1536, 1540 (11th Cir. 1984) and United States v. Wise, 550 F.2d 1180, 1195 (9th Cir.) cert. Den. 434 U.S. 929 (1977).**

257.    Defendants have also far exceeded the statutory minimums in terms of producing more than 10 copies and the value of infringing copies more than $2,500.00, since this action describes a much more massive infringement operation, involving thousands upon thousands of copies

unlawfully made & possibly myriad other song materials. The defendants must be stopped.

258.    A defendant convicted of violating **17 USC 506(a)** may also be subject to penalties or fines of $250,000 for unauthorized reproduction or distribution of at least 10 copies with a retail value of more than $2,500 **(18 USC 2319(b).  (But see Relief Section)**

## EIGHTH CLAIM FOR RELIEF

## TRAFFICKING IN COUNTERFEIT LABELS

259.    Plaintiff restates and reavers the averments of paragraphs 1 through 258 as if fully set forth herein and further alleges: **18 USC 2318** is not a copyright statute, and the scope of the protections under the statute are broader than those afforded by the Copyright Act.

260.    The plaintiff, copyright holder possesses not only the right to reproduce and distribute a given work, but also a limited right to control its distribution and reproduction.  This includes protection against <u>diminution in value</u> of a copyrighted work caused by the mere appearance of allegedly infringing works in the market place.

261.    Counterfeit copies, regardless of the price for the counterfeit item; diminishes the value of an original copyrighted work because the victim/author loses a great share of the potential market to putative authors who didn't create the works in the first instance.  In addition, the copyright

holders market share is further diluted by the subsequent reproduction and distribution of infringing products.

262.    During the drafting of **18 USC 2318**, the drafting committee expressed the position, shared by the department of justice, that counterfeiting is a more serious crime than traditional piracy. "Counterfeiting defrauds not only the … industries, but also the consumer by leading him to believe that he is purchasing an authentic product" (**S. Rep. 274, Pub. L No. 97 180 at 8 (1981)**)

263.    Furthermore, defendant's conduct violates **18 USC 2318 & 2320** and an accounting must be had to determine the "probable or intended" loss to plaintiff as a result of these activities.

264.    Plaintiff further alleges:

   a. Defendants are allegedly trafficking in labels for phono-records and at least (1) one motion picture and are still transporting such products in interstate commerce.

   b. The labels attacked to all products relating to the derivative version of songs defendants derived from plaintiff and infringed are counterfeit, and made to appear to be genuine, when in fact, they are not. (**See: 18 USC 2318 (b)(1)**) and such labels have not previously existed, but exist now to defraud the consumer with regard to the authenticity of the product.

   c. The counterfeit label was affixed or designed to be affixed to a phono record, a computer program or a copy of a motion picture or other audiovisual work, (even though it is not necessary the labels be actually attached to a work).

d.  The defendants therefore knew the labels were counterfeit and intentionally committed the offense.

e.  The offense occurred in the special maritime or territorial jurisdiction of the United States and involved the use of the United States Mails and facilities of interstate and foreign commerce, or involved in a computer program.  **(18 USC 2318(c).**

265.     The maximum fine for such a crime is $250,000.

# NINTH CLAIM FOR RELIEF
## INTERSTATE TRANSPORTATION OF STOLEN PROPERTY

266.     Plaintiff restates and reavers the averments of paragraphs 1 through 265, as if fully set forth herein and further alleges that the aforementioned actions of the defendants also implicates them as violators of **18 USC 2314**, relating to interstate transportation of stolen property.

267.     Defendants surreptiously and extortionately "physically took" original songs belonging to plaintiff using the subterfuge of extortion and confidence games to cause plaintiff to expose much of its original song catalog.  After "taking" the original songs from plaintiff via extortion, defendants continued to re-create the work in the form of a derivative work in order to attempt to disguise their conduct and legitimize the resulting work for transport across state lines for unlawful purposes and unlawful exploitation into interstate commerce.

268.     Pursuant to the letter of **18 USC 2318**, plaintiff seeks total civil forfeiture and destruction or other disposition of all counterfeit labels and all

articles to which counterfeit labels have been affixed or which were intended to have had such labels affixed **(18 USC 2318(d) & (17 USC 509(b) & (19 USC 1615) & (19 USC 1601).**

269.    Thus, there is ample "<u>probable cause</u>" to establish that defendants may be conducting a huge counterfeit/infringement operation that is affecting interstate commerce as well as the rights and property of innocent authors via such a high-powered counterfeiting operation. **(See Relief Section).**

## TENTH CLAIM FOR RELIEF
## THE TRAVEL ACT

270.    Plaintiff repeats and reavers the averments of paragraphs 1 through 269 as if fully set forth herein; and further alleges that **18 USC 1952**, commonly known as the **Travel Act**, makes it a federal offense to travel or use a facility in interstate commerce to commit inter alia, "Extortion" in violation of the laws of all states where defendants traveled selling their unlawful wares, namely, stolen and original songs which were thereby converted into unlawful derivative works.

271.    Defendants are alleged to have used interstate commerce, the United States Mails and emails to obtain song property from original authors. After obtaining the songs, the songs are recreated and distributed in all (50) fifty states, and many foreign countries, such is the size and scope of the mission of the herein alleged enterprise.

272.　It is further alleged that defendants conspired to violate the <u>Travel Act</u>, and for merely conspiring to violate the Act, the Travel Act provides in pertinent part: **(See: 18 USC 1952(a)(1)(3)(b)(2)), for sake of brevity**).

273.　In any event, defendants are accused of engaging in a scheme to exploit the original songs of authors by re-creating them and then exploiting the works worldwide.

274.　At first, "**Inside Sessions**", a UMG subsidiary, collects the songs and channels them through a type of "secret A&R department" which supposedly critiques the songs submitted.  After songs are secretly "selected" for theft, they are then channeled to artists at other subsidiaries and promoted as if the songs origins were totally legitimate and not suspect. **(See Exhibit B, C & O).**

275.　The mere attempt and eventual act of "collecting songs" from authors worldwide in order to re-create derivatives to be owned and exploited by the defendants and their legitimate enterprise is a crime of gargantuan size and implication.

276.　The Travel Act was one of several bills enacted into law by the 87th Congress as part of the Attorney General's 1961 legislative program directed against "organized crime".  Then Attorney General Robert Kennedy testified at Senate and House hearings that federal legislation was needed to aid state and local governments, which were no longer able to cope with the increasingly complex and interstate nature of large-scale, multiparty crime.  The states intent was to dry up traditional sources of funds for such illegal activities.  **(See: H.R. 1246 etc., 87th Cong. 1st Session, (1961) & TVA v. Hill, 437 U.S. 153, 173 (1978)).**

277.    Defendants alleged wrongful activities amount to little more than a "**shake down operation**" aimed at taking song property from their rightful owners.  Such conduct is deemed to be violative of **18 U.S.C. 1952**.

278.    In this case, the defendant enterprise caused third party persons to cross state lines to infringe and extort and exploit property for unlawful purposes.

279.    Likewise, many authors are not aware that it is unlawful to paraphrase original expressions and make derivatives without the owner's permission.

## OBTAINING SONGS BY EXTORTION IS A NATIONAL PROBLEM

280.    The ability of the complained of enterprise to charge fees to cause authors to send their works across state lines, and then have the works paraphrased as "derivatives of the original," allows these defendants to operate "more than a monopoly", since the naïve authors never know when defendants will unilaterally decide to unlawfully create derivative works of their original works obtained by the aforementioned extortionate conduct. **(See: United States v. Hughes, 389 F.2d 535 C. C. A. 2d. Cir. 1968, McIntosh v. United States, 385 F.2d. 274 C. C. A. 8th Cir. 1967); Marshall v. United States 355, F.2d 999 (C. A. 9th Cir.) cert. Denied, 385 U.S. 815 (1966) & United States v. Fabrizio, 385 U.S. 263, 266-267 (1966).**

281.    Defendants are therefore alleged to be continuously traveling in interstate commerce, as inter national conglomerates, using the mails to

83

obtain property unlawfully, merely to distribute the proceeds of the allegedly unlawful activity, while committing myriad schemes and crimes to further the alleged criminal activity **(See: 18 USC 1952(a)(1)(2)(3)(6)(2)).**

282.    The "multiple schemes" outlined in this complaint are similar in purpose but not similar in nature, since the overall "purpose" of the multiple schemes is of course to maintain number one status and market position, yet, along the way, many deeds must be accomplished to "re-legitimize" the wrongfully obtained work, by way of mail fraud and extortion.

283.    However, the nature of the alleged multiple schemes are markedly different in that the extortionate phases of the scheme are unknown to many in the enterprise, as is the secret ownership of innocent author's works.  The enterprise keeps many of its own members in the dark as to its total inner workings and purposes.  **(See: Apparel Art Int'l. v. Jacobson, 967 F.2d 720, 722 (1st Cir. 1992).  (For Relief sought, See Relief Section).**

## ELEVENTH CLAIM FOR RELIEF
## THEFT AND MISAPPROPRIATION OF TRADE SECRETS UNDER ECONOMIC ESPIONAGE ACT

284.    Plaintiff restates and reavers paragraphs 1 through 283 as if fully set forth herein, and further alleges that **18 USC 1832** forbids anyone from converting a trade secret, that is related to or included in a product that is produced for or placed in interstate commerce or foreign commerce, from inuring to the benefit economically of anyone other than the owner thereof,

and by intending or knowing that the offense will injure any owner of that trade secret, knowingly:

a. Steals or without authorization appropriates, takes, carries away or conceals, or by fraud artifice or deception obtains such information;

b. Without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates transmits, delivers, sends mails, communicates or conveys such information;

c. Receives, buys or possesses such information, knowing the same to have been stolen or appropriated, obtained or converted without authorization; attempts to commit any offense described in paragraphs (1) through (3) or (5), or conspires with one or more other persons to commit any offense described in paragraphs (1) through (3) and one or more such persons do any act to effect the object of the conspiracy, shall, except as provided in subsection (b) be fined under this title or imprisoned not more than 10 years or both.  (b) Any organization that commits any offense described in subsection (a) shall be fined not more than $5,000,000.

285.    It is thus therefore alleged that each defendant involved with the re-creation of plaintiffs work into derivatives subsequently owned by them, as well as the packaging, promotion, marketing and commercial exploitation of this plaintiff authors original songs, are deemed to be persons who "did acts of infringement paraphrasing original works into derivative works" which were designed to "effect the object of the conspiracy", namely, original song content not belonging to them, and unlawfully purloined in

extortionate schemes and a massive counterfeit operation which conceals or imbeds the stolen songs deeply within new album releases where videos are also created.

286.    "**Inside Sessions**" executives, under the guidance and direction of other unknown and known executives at Universal Music Group, knowingly and intentionally, "reverse engineered" plaintiff's chorus lines, turning them into unlawful derivative works of plaintiffs original efforts, merely for the sake of private financial gain, thereby converting said trade secrets into recreated derivatives of plaintiff's, intending fully to injure the plaintiff in his business and property by such mutilation and exploitation, and subsequently placed such items into interstate commerce and foreign commerce.

287.    It is further alleged that after defendant persons Inside Sessions and staff identified the elements of plaintiff's songs that were secret, such secrets were misappropriated to the detriment of plaintiff's business and property.  It is the intent of Congress that intangible things, like songs, receive the same protection as tangible forms of property, and the actions of these defendant persons are being viewed at law as violative of these precepts. **(See: S. Rep. No. 359, 104th Cong., 2d Sess. 16 (1996)**.

288.    Defendants full knew of the technology and craft employed by plaintiff in the construction of his commercial songs, and were also aware of the great pains a music publisher must undergo to protect his or her secret song writing formulas.  Songwriting is an art, now taught in colleges, and chorus lines, are the sum total result of the application of rules related to the magic of making songs great or mediocre.  In this regard, the "proprietary

markings" of a commercial song would be factors such as "<u>Metric Feet</u>", "<u>Onomatopoeia</u>", "<u>Assonance</u>", "<u>Rhyme Scheme</u>", "<u>Metaphor</u>" and <u>Noun Selection</u>, just to name a few.

289.    The defendant persons furthermore believe the information contained within the body of plaintiff's songs was valuable to the plaintiff and to the marketplace targeted by plaintiff as well as defendants, and that such information was proprietary to plaintiff and plaintiff alone.  Thus, the taking of plaintiff's "song trade secrets" was not done by accident, mistake or ignorance, but instead, with willfulness, full intent and knowledge of the wrongful nature of such "<u>reverse engineering</u>" as well as its consequences.

290.    **18 U. S. C. 1839** defines the term "<u>trade secret</u>" very broadly, and includes all types of information, however stored or maintained, which the owner has taken reasonable steps and measures to keep secret, and which has independent economic value.

291.    The "reasonable measures" taken by plaintiff to protect his trade secrets, for the most part, are the process of locking deep within plaintiff's brain such secrets, and are never to be uttered to any human, and such information was obtained over years of research and analysis, and subsequently memorized physically by plaintiff, and such information represents matter not generally known by the public as well as matter not readily ascertainable through proper means by the general public as well, and such information derives independent economic value actually as well as potentially.

292.    Trade secrets need be only minimally novel.  **(See: Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476 (1974) & Buffets, Inc. v. Klinke, 73 F**

**3d 965, 968 (9th Cir. 1996)**. The art or craft of songwriting is not generally known by the general public, defendant persons have resorted to improper means of acquiring plaintiff's trade secrets, and even though plaintiff himself supplied the defendant persons with said trade secrets, willingly, such information was intended to remain a trade secret, and remains a trade secret which defendants have wrongfully appropriated. **(See: Rockwell Graphics, Inc. v. DEV Indus., Inc., 925 F 2d 174 (7th Cir. 1991)**

293.    The value of a similar trade secret is difficult to fathom, and is logically based upon the market results for a particular song or artist as well as the overall appeal of both, taking into consideration the royalties paid for the songs publication and exploitation, after reaching #1 status and maintaining it for a period of time.

294.    Such trade secrets mandate considerable research and application of sound literary principles, which make production costs for a commercial song of such caliber to be in the range of &10,000 to $150,000 dollars, as well as what defendant persons actually received in profits from each song infringed.

295.    Therefore, the very act of misappropriating plaintiff's song trade secrets and commercial songs was indeed intended for the economic benefit of "contract artists" type third-parties, who represent direct competition to plaintiff, benefiting such third parties other than the plaintiff, or rightful owner of the property.

296.    By instituting and implementing "**<u>Inside Sessions</u>**" method of unlawfully obtaining songs or trade secrets, defendants knew what type songs or trade secrets they were looking for and which songs contained such

information and completely believed plaintiff to be in possession of such
trade secrets.

297.    The **ACT** requires also the forfeiture of any proceeds or property
derived from violations of the **ACT** and the Court may order the forfeiture
of any property used to commit or to facilitate the commission of the crime.
While the **ACT** itself doesn't allow for civil forfeitures, this civil action
seeking injunctive relief is equivalent and sufficient.

298.    Damages sought are in the form of actual loss to the plaintiff caused
directly by defendant's misappropriation, as well as based upon the unjust
enrichment of defendants at expense of plaintiff and his property, and not
taken into account in computing actual loss.

299.    **The Mandatory Victims Restitution Act of 1996, (MVRA),**
codified at **18 U.S.C. 3663A**, requires restitution be made in all sentencing
proceedings for convictions of, among other things, any offenses against
property, including any offense committed by fraud and deceit, and in
which an identifiable victim has suffered a physical injury or pecuniary loss,
especially where it is shown such valuable property and information has
been introduced into interstate commerce and crossed many state lines in
the process.

300.    Defendants therefore do violate **18 USC 1832(a)(1), (2), (3), (4) &**
**(5) & (b)** since they, with extortionate purpose and with and without the
original copyright owners consent, converted the trade secrets of the
mechanics of plaintiffs songs, placed these into interstate commerce, for
economic benefit of persons other than the plaintiff, knowing plaintiff
would be injured by the theft of his song technology as well as original

89

copyrighted expression, and thereby, carried away, concealed, and by fraud and deceit, did many unlawful predicate acts to attempt to legitimize the theft of authors original works, using the mails to communicate or convey the stolen song information, and or, receiving buying or possessing such vital and secret song information, knowing the same to have been stolen or appropriated, obtained or converted without authorization, thereby conspiring with herein alleged others, are liable to plaintiff, and for each conglomerate involved, plaintiff seeks $5,000,000 per organization.

## TWELFTH CLAIM FOR RELIEF
### Breach of Confidential & Fiduciary Relationship

301.    Plaintiff repeats and re-avers paragraphs 1 through 300 as if fully set forth herein and further states and alleges that, the relationship created by **"Inside Sessions"** and the plaintiff's company, YoWorld Music, is deemed to be a confidential and fiduciary one due to defendants at **"Inside Sessions"** acting as "consultant guides" critiquing and providing expert guidance to neophyte and experienced authors as well. **(See Critiques, Exhibit(s) B & C).**

302.    The fiduciary relationship created by "Inside Sessions" was based on trust and confidence that defendants would not breach such trust. The

90

defendants were obligated to maintain good faith, and avoid any conflicts of duty or self-interest. **(See: Canadian Aero Serv. Ltd. V O'Malley, [1974] S.C.R. 592, at p. 606.)**

303.    Defendants cannot complain that plaintiff cooperated in his defalcation or that plaintiff failed to take reasonable care for his own interests.

304.    Plaintiff, in good faith, entered into the complained of fiduciary relationship with "Inside Sessions" since Inside Sessions held itself out to possess superior knowledge and skill in terms of song writing, providing advice and consultations for any authors who paid the $200 fee. **(See: Lynch v. Crittenden & Co. (1993) 18 Cal. App. 4th 802, 809, 22 Cal. Rptr. 2d 636, 641 – 642 & especially: Tri-Growth Country City Ltd. v. Sillcorf, Burdman, Dugnan and Eisenberg (1989) 216 Cal. App. 3d. 1139, 1150, 265 Cal. Rptr. 330, 335.)**

305.    The "<u>fiduciary relationship</u>" need not be of a legal nature, it may be moral, social, domestic or merely personal. **(See: Pryor v. Bristine (1963) 215 Cal. App. 2d 437, 446, 30 Cal. Rptr. 376, 381)**.

306.    Thus, mere the existence of a fiduciary relationship embraces both technical fiduciary relationships as recognized by law and informal relations which exist whenever one man reposes trust in another **(See: In Re: daisy Systems Corp., Supra at 1172 – 1175) Beery v. The State Bar (1987) 43 Cal. 3d. 802, 739 P.2d 1289, 1294, 239 Cal. Rptr. 121 & Barbara A. v. John G., (1983) 145 Cal. App. 3d 369, 383, 193 Cal. Rptr. 422.)**

307.    Therefore, a confidential and fiduciary relationship indeed exists between "The defendants" and plaintiff in obtaining plaintiff's property

unlawfully, and defendants breached this fiduciary duty, and such breach is the ultimate and proximate cause of the damage plaintiff is claiming and the nature and extent of any and all of plaintiff's damages are well established. **(See: Relief section)**.

**Respondeat Superior – Vicarious & Contributory Liability – Chain of Responsibility Doctrine – Controlling Person Doctrine – Agency Doctrine**

308.    Plaintiff repeats and re-avers paragraphs 1 through 307 as if fully set forth herein and further alleges and states that liability in this case extends throughout the entire chain of corporate responsibility, and such liability is special liability in that it applies to the corporation, its subsidiaries, boards of directors, managers and agents within said chain of responsibility or any employee of the organizations herein complained of.

309.    In this case, any person(s) involved in the management of organizations that violated laws and rights of the plaintiff are immediately implicated in "managerial liability" under theories of "**Respondeat Superior**", and this theory applies to all company directors of all subsidiaries involved with exploitation of the complained of songs, since all were in a position to influence the conduct of the organizations complained of in relation to the predicate offenses and because not one defendant took any reasonable precautions or exercised due diligence to prevent the complained of acts from being perpetrated.

310.    Thus, all actions and statements made by the defendant persons to aid or abet the complained of extortion and copyright infringement are deemed

to be "vicarious acts" that prove the "intentions" of the complained of organizations.

311.    Furthermore, all the heretofore mentioned extortionate statements and actions made by defendants and their enterprise, "were not" made outside the authority of this or that persons job, but instead, a "craftily weaved" company inside plan to obtain songs by offering to be "consultants" to authors and "critiquing" their songs.  Such a reality implicates the corporations vicariously liable to the plaintiff.

312.    Or perhaps, in essence, the "abstract and derivative" creations of the defendant persons in this case, namely the selective lifting of each and every chorus line of plaintiff's (10) ten songs, and the chorus lines only, creates a "troubling proposition" of which only a jury can settle.  **(But see: Chafee, Reflections on the Law of Copyright, and 45 Col. Law Review.  503, 513 (1945) & Learned Hand's Treatise and Judgment in Arnstein v. Porter)**.

## Exhibit Description:

**Exhibit A**:  Copyright Registration of YoWorld Music Company collective works, containing song "We Got It Poppin".  SRU-452-2880

**Exhibit A1**:  Copyright Registration of YoWorld Music Company Collective Works, containing songs heretofore known as "Everybody's Talkin bout Us", "I'm A Maniac", Wish A Mutha Fugga Would", "Shoot To Kill", "My Streets", "I'm So High", "Smoke, Drink, Cuss, Fight", "Tear Tha Roof Off", "Kings In The City" & "Slow Neck".

**Exhibit B**:  Consultation/critique by "Inside Sessions" of (3) three songs owned by the plaintiff.

**Exhibit C**:  Consultation/critique by "Inside Sessions" of (3) three songs owned by the plaintiff.

**Exhibit D**:  "Inside Sessions" method of gaining authors songs and getting them into database, claiming to be a teaching device.

**Exhibit E**:  Albums privately released by plaintiff during years 2000 – 2005: "Thongs", "Illanoize", "God Pick Up The Phone", "The Great JC", "Shoot Ta Kill", "When Will My People Be Free", "God child", "The Delegation", "God Child, Street Keeper", "Armageddon", "Latreece, feat. David", "Baltimore Raven", "Thug Inc.", "Urban Legacy", "Keyz To Tha Kingdom" & Rowdy Mob Syndicate Urban Legacy.

**Exhibit F**:  Sampling of YoWorld Music Street Team CD distribution team members during years 2000 to 2003.

**Exhibit G**:  Universal Music Group's network of companies, which includes "Inside Sessions".

**Exhibit H**:  Baltimore City permit to hold live concert in May 2002.

**Exhibit I**:  Armageddon album property rights form signifying 2/21/03 release date.

**Exhibit J**:  Certified mail to Atlantic Records executive, Mr. Adam Fischell.

**Exhibit K**:  Letter to Atlantic Records executive, Mr. Rich Christina.

**Exhibit L**:  Letter from Atlantic Records, Mr. Rich Christina.

**Exhibit M**:  Letter from YoWorld to Universal Music Group's Dino Delvaille concerning suspicion of company songs being stolen.

**Exhibit N**:  Letter from YoWorld to Universal Music Group's Dino Delvaille releasing (4) four acts to Universal Music Group for consideration.

**Exhibit O**:  Multiple email transactions between YoWorld Music Company and Universal Music Group's "Inside Sessions" program.

**Exhibit P**:  Brandy interviews concerning song "Lets Talk About Our Love".

**Exhibit Q**:  YoWorld Music Company submits (2) albums of songs (38), thirty-eight songs to "Inside Sessions" program.  On the same day, "Inside Sessions" claimed by email that no A&R executives worked there any more.  **(See Exhibit O).**

**Exhibit R**:  Kanye West admits copying others original materials without authorization.

**Exhibit S**:  Kanye West Admits copying others materials, again without authorization.

**Exhibit T**: Pre-Registration Certificate w/ accompanying song titles....**1-3912351**

**Exhibit U**: Sample Distribution/Management/Production Agreement relating to the songs at issue.

## RELIEF SECTION

1. Direct and Contributory Copyright Infringement against all corporate defendants, seeking damages and profits after a just accounting.  Liability is extended to the defendants thusly: Universal Music Group **17 USC 106 1, 2, 3, 4 & 5** since it is alleged they unlawfully reproduced plaintiffs works, prepared derivative works based upon the copyrighted works, distributed the works, in order to perform the works publicly and displayed the infringing works to the public after an accounting.  Universal Music Group is liable to

the plaintiff for damages and profits. Approximately $100,000,000 sought for copyright infringement alone against the conglomerates and directors and executives.

2. Direct Copyright Infringement against artist (2) defendant persons extends to **17 USC 106 (4)** only, and damages and profits are attainable to the plaintiff after an accounting. Artist/defendant persons who are liable in such a manner include the following: Kanye West, Brandy Norwood, Lil Wayne, T.I., Eminem, Young Buck, Lloyd Banks, Fat Joe, Ludicrous, John Legend, Roy Jones, Jr., Juvenile & Ying Yang Twins. Approximately 50,000,000.00 collectively in liability against the defendant employees.

3. Contributory Copyright Infringement liability is directed against the following corporate managers and subsidiaries: Zach Horowitz, Nick Henry, Shawn (Jay Z) Carter, 50 Cent, L.A. Reid, Baby, Cash Money Records, Inside Sessions, Dino Delvaille, Damon Dash, Roc-A-Fella Records Def Jam Music Group, G-Unit Records, Inters cope Records, Geoff Siegel, Brian Wittmer, Ted Turner, Ahmet Ertegun, Atlantic Records, Warner Chappell Publishing Company, Adam Fischell, Rich Christina, Summer Redstone, Paramount Pictures, BET, MTV & VH1. Damages and profits are being sought after an accounting. Approximately 30,000,000.00 collectively against the above, not including a triplicate measure of damages.

4. Lanham Act violations and violations relating to unfair competition are to be calculated after an accounting and are directed against all defendant persons.

5. Civil RICO relief for damages caused to plaintiff's business and property are sought in triplicate after a fair accounting of defendant's profits and are being directed against all implicated defendants. **(Triplicate the above to arrive at 600 million dollars).**

6. Bank Fraud relief for damages caused to plaintiff's business and property is statutory in nature.

7. Extortion relief for damages caused to plaintiff's business & property is statutory in nature.

8. Criminal Copyright Infringement relief for damages caused to plaintiff's business and property cannot be ascertained without a true accounting of defendants' profits statutorily, a fine of $250,000 should be applied to all parties found guilty of criminal copyright infringement.

9. Trafficking in Counterfeit Labels relief for damages caused to plaintiff's business and property is statutory as well and still an accounting must be had to determine the extent of the damages. The maximum statutory penalty of $250,000 per defendant should be applied. Defendants directly implicated in such activities are Universal Music Group and Atlantic Music Group.

97

10. Interstate Transportation of Stolen Property relief sought for damages caused by such activities is statutory as well.

11. The Travel Act Relief sought for Damages caused by violations of this Act are also statutory, and every defendant so implicated should be fined the maximum penalty of statutory mandate.

12. Relief for Theft and Misappropriation of Trade Secrets is statutory in nature, and all corporate defendant persons should be fined the maximum penalty of $5,000,000 per organization. Such implicated organizations include the following: Universal Music Group & Warner Music Group.

13. Relief for Breach of a Confidential and Fiduciary Relationship is based on the results of the true accounting of defendant's profits.

14. Relief under Theories of Respondeat Superior, are likewise based on the results of a true accounting of defendants profits and for any other and further relief this Court deems just and proper.

## **CERTIFICATE OF SERVICE**

**I HEREBY DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS A TRUE AND CORRECT ACCOUNT OF THE HEREIN ALLEGED MATTERS AND EVENTS, AND THAT THE FOLLOWING ENTITIES REPRESENT THE INDIVIDUAL DEFENDANT PERSONS NAMED IN THE CAPTION AS INTERESTED PERSONS, AND WERE**

**MAILED A TRUE AND CORRECT COPY OF THIS COMPLAINT ON OR ABOUT** _Tuesday_ **MAY** _2nd_ **2006.**

BY: Robert R. Prunte'

**JENNER & BLOCK**, C/O MR. MICHAEL B. DESANCTIS, 601 THIRTEENTH STREET, N.W. SUITE 1200 SOUTH, WASHINGTON, D.C. 20005; & **THE UNITED STATES COURTHOUSE** OF THE DISTRICT OF COLUMBIA, F. BARRETT PRETTYMAN BUILDING, 333 CONSTITUTION AVENUE, N.W. WASHINGTON, D.C. 20001, C/O, CLERK'S OFFICE.

BY:

ROBERT R. PRUNTE'

1702 LINDEN AVENUE

BALTIMORE, MARYLAND 21217

1.410.225.9940  / 1.301.514.4028

99

**Robert R. Prunté, (pro sé)**
1702 Linden Avenue
Baltimore, Maryland 21217

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROBERT R. PRUNTÉ** | **CASE NUMBER: 06CV00480** |
| **Plaintiff,** | |
| **Vs.** | **JUDGE:  Paul L. Friedman** |
| **UNIVERSAL MUSIC GROUP, et al;** | |
| **Defendant (s)** | |

## ORDERED

It is hereby Ordered that the Operative Complaint is become the "Amended Complaint As Of Course", and defendants have the proscribed time to provide an answer or other response to such Amended Complaint, and any motions or answers made prior to such Amendment As Of Course, are become mooted by the now operative and Amended Complaint As Of Course.

1

1

2    Honorable Paul L. Friedman, U.S.D.J.

3

4

5    **<u>CERTIFICATE OF SERVICE</u>**

6

7    I HEREBY DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS A TRUE AND CORRECT ACCOUNT OF THE

   HEREIN ALLEGED MATTERS AND EVENTS, AND THAT THE FOLLOWING ENTITIES REPRESENT THE INDIVIDUAL

8    DEFENDANT PERSONS NAMED IN THE CAPTION AS INTERESTED PERSONS, AND WERE MAILED A TRUE AND CORRECT

   COPY OF THIS COMPLAINT ON OR ABOUT _____ MAY 2ᴺᴰ 2006.

9

10

11    BY: Robert R. Prunté

12

13    **UNIVERSAL MUSIC GROUP**, c/o Jenner & Block & Mr. Michael DeSanctis, 601 Thirteenth Street N.W.Suite 1200 South,

   Washington, D.C.20005, **VIACOM INTERNATIONAL**, C/O SPIEGEL & UTRERA, P.A.P.C., 45 JOHNS STREET 711, NEW

14    YORK, N.Y. 10038 & **THE UNITED STATES COURTHOUSE** OF THE DISTRICT OF COLUMBIA, F. BARRETT

   PRETTYMAN BUILDING, 333 CONSTITUTION AVENUE N.W. WASHINGTON, D.C. 20001, C/O, CLERK'S OFFICE.

15

16    BY

17    ROBERT R. PRUNTÉ

   1702 LINDEN AVENUE

18    BALTIMORE, MARYLAND 21217

   1.410.225.9940  / 1.301.514.4028

19

20

21

22

23

24

25

2